**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-------------------------------------------------------------------X**
**ROSANNA MAYO-COLEMAN,**

Civil Action No: 14-CV-00079-UA

**Plaintiff,**

**AMENDED COMPLAINT**

    **-against-**

Trial by Jury Demanded

**AMERCIAN SUGAR HOLDING, INC.**
**AND ROBERT JANDOVITZ,**

**Defendants.**

**-------------------------------------------------------------------X**

    **PLAINTIFF ROSANNA MAYO-COLEMAN** (hereinafter referred to as "Plaintiff"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, amends her Complaint and alleges, upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

**STATEMENT OF THE CASE**

    1.    This is a proceeding to enforce the rights of the Plaintiff and other persons similarly situated, to equal employment opportunities, their rights as employees, and their civil rights as citizens of the United States and as New York State residents.  Plaintiff seeks money damages, as well as an injunction restraining Defendant from maintaining a policy, practice, custom and/or usage of:

    a.    Discrimination against Plaintiff and other persons similarly situated because of gender, race, color, and age with respect to compensation, terms, conditions, and privileges of employment, including without intending to limit, hiring, transfer, promotion and pay; and

b.      Limiting, segregating and classifying employees of Defendants in ways which deprive Plaintiff and other persons similarly situated of equal employment opportunities and/or otherwise adversely affecting their status as employees because of gender, race, color, and age.

2.      Defendants have consistently and/or purposefully and/or negligently deprived Plaintiff and other persons similarly situated of the rights guaranteed to them under Federal and New York State Laws with the intent and design, both directly and indirectly, of fostering a hostile work environment resulting from gender, race, color, and age discrimination, as well as sexual harassment and retaliation, to the detriment of the Plaintiff and other persons similarly situated.

## THE PARTIES

**Plaintiff**

3.      Plaintiff is a female citizen of the United States who currently resides in Bronx, New York.

4.      Plaintiff is currently employed by the Defendant American Sugar Holding Inc. (hereinafter referred to as "Defendant American Sugar"), a cane sugar refining company, where she has worked since 1988. Plaintiff was employed at Defendant American Sugar at all relevant times.

5.      At all relevant times, Plaintiff was more than forty years of age.

6.      Plaintiff is an employee within the meaning of the New York State Executive Law, the New York City Human Rights Law and the federal employment discrimination laws known as "Title VII."

7.      Plaintiff was willing and able to perform her employment duties and obligations and was qualified for the employment positions she held at Defendant American Sugar as well as the employment positions that she sought but were withheld from her.

**Defendants**

8.      Upon information and belief, at all times herein, Defendant American Sugar is a corporation duly organized and existing under the laws of the State of Delaware and is registered to do business in the State of New York.  Defendant American Sugar's headquarters is located at One Federal Street, Yonkers, New York 10702.   Upon information and belief, Defendant American Sugar employs more than 100 employees.

9.      Defendant American Sugar was, at all times relevant herein, an "employer" within the meaning of 42 U.S.C. § 2000e-(b), as well as the Executive Law of New York State and New York City Human Rights Law.

10.      Defendant Robert Jandovitz is the Human Resources Manager of Defendant American Sugar (hereinafter "Defendant HR Manager Jandovitz") with a business address of One Federal Street, Yonkers, New York 10702.

**JURISDICTION AND VENUE**

11.      This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' long and continuing pattern of discrimination of Plaintiff based on gender, race, color and age, as well as retaliation against Plaintiff.

12.      This Court has Jurisdiction over this action under 42 U.S.C.A. § 1981 et. seq., 42 U.S.C.A. § 2000(e) et. seq., 29 U.S.C. § 621 et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).  This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., (the 'Executive Law"), which is known as the Human

Rights Law, and Title 8 of the Administrative Code of the City of New York, to redress discrimination with respect to terms and conditions or privileges of employment.

13.     This court has additional supplemental and pendant jurisdiction over all related claims.

## PROCEDURAL BACKGROUND

14.     Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and originally filed this action on or about January 6, 2014, within ninety (90) days of her receipt of the Notice of Right to Sue issued by the EEOC on or about November 27, 2013.  Plaintiff initially filed her Summons and Complaint as a Pro Se Plaintiff.  In or about April of 2014, Plaintiff made a Motion for Leave to Amend her original Complaint.

15.     In or about, June of 2014, Plaintiff retained the undersigned to represent her, and was granted until July 17, 2014 to amend the Complaint.

16.     Plaintiff seeks to recover attorneys' fees incurred by this lawsuit pursuant to N.Y. Exec Law. §§ 297 and/or the Administrative Code of the City of New York.

17.     This Complaint is additionally brought pursuant to any other cause of action which can be inferred from the facts set forth herein.

18.     Plaintiff demands a jury trial.

## OPERATIVE FACTS

**Plaintiff's Career at Defendant American Sugar**

19.     Plaintiff was hired by Defendant American Sugar in 1988.

20.     It was quickly clear to Plaintiff that Defendant American Sugar was a hostile place for minorities when she noticed a noose hung on the wall at the beginning of her

employment.  When she noted her objection, a supervisor removed the noose, but no action or investigation of any kind was taken.

21.     Plaintiff also quickly noticed that very few women worked at Defendant American Sugar.  Upon information and belief, when Plaintiff started, she was one of seven women out of approximately 150 employees.  Although other women were hired from time to time, upon information and belief, less than ten percent of Defendant American Sugar's employees have been, or are, female.

22.     Still, Plaintiff was happy to be able to earn a living to support her family and she looked the other way and kept her head down.  Plaintiff was also excited about the overtime opportunities that allowed Defendant American Sugar employees to make a significant hourly rate.  Although Defendant American Sugar assigned overtime based on seniority, because Plaintiff was almost always willing to pick up overtime shifts, she was able to enjoy the extra income from time to time.  She looked forward to becoming more senior so that she could earn more overtime pay.

23.     Plaintiff was initially hired as a laborer to assist the operator of sugar packaging machinery.  Although she had no previous mechanical, factory or machinery experience, Plaintiff quickly excelled and was soon promoted to machine operator.  Plaintiff was one of few employees who learned how to run all of the many different sugar machines.

24.     Before long, Defendant American Sugar began to rely on Plaintiff to train other employees on the various sugar packaging machines.

25.     Plaintiff's strong work ethic, commitment to doing her job to the best of her ability, and natural mechanical talent earned the begrudging respect or her mostly male co-workers and superiors.

26.     Plaintiff generally enjoyed a happy work atmosphere for the first ten years of her career at Defendants.

**Plaintiff Complains of Race Discrimination**

27.     In or about 1999, Plaintiff noticed that a Caucasian co-worker was being offered more overtime opportunities than she was entitled to at the expense of her minority co-workers. Plaintiff advised her Supervisor but the disparate treatment continued.  Plaintiff received a right to sue letter from the EEOC, but agreed not to sue when Defendant HR Manager Jandovitz agreed to make sure overtime opportunities were offered in a fair manner.

28.     Plaintiff's co-workers admired her for standing up and complaining about discrimination at Defendant American Sugar.  She was rewarded for her efforts when she was voted to serve as her co-workers' Union Representative in 2002.

**Plaintiff Works with Defendant HR Manager Jandovitz as the Union Representative**

29.     As the Union Representative, Plaintiff regularly appeared before and worked with Defendant HR Manager Jandovitz.   Plaintiff and Defendant HR Manager Jandovitz also regularly attended Union meetings together.

30.     Plaintiff and Defendant HR Manager Jandovitz enjoyed a symbiotic relationship which benefitted both Defendant American Sugar and its employees.

**Plaintiff is Promoted to Mechanic's Assistant, But is Later Passed Over For the Mechanic's Position**

31.     In 2002, Plaintiff's hard work and natural mechanical talent paid off when she was promoted to be a Mechanic's Assistant (known as a "Tech 2").  Plaintiff was thrilled to be learning new skills and happy to be able to earn more money to support her family.   Plaintiff looked forward to working towards and being promoted to the Mechanic position (known as a "Tech 1").  Due to her extensive operations and role as a trainer of each of the different sugar

packaging machines, Plaintiff was able to perform many of the tasks that the Tech 1's performed, and even some that they could not perform.

32.     Thereafter, however, she was never promoted to Tech 1 because of her gender and race.  Instead, less qualified males were promoted instead of female and African-American Tech 2s.

33.     Defendant American Sugar advised the African American and female Tech 2s that they were not eligible for the promotion because they had not taken a necessary test.  Upon information and belief, none of the males who were promoted to Tech 1 took the allegedly "necessary test."

**Defendant HR Manager Jandovitz' Turns Against Plaintiff During Strike Negotiations**

34.     In or about October of 2004, the Union and Defendant American Sugar began employment contract negotiations.  In or about November of 2004, negotiations became heated and resulted in an angry altercation between Defendant HR Manager Jandovitz and the Union President in front of Plaintiff.   Defendant HR Manager Jandovitz told Plaintiff that he would no longer negotiate with the Union President.  When he later denied saying so, Plaintiff confronted Defendant HR Manager Jandovitz about his lie.  Thereafter, Defendant HR Manager Jandovitz was extremely distant to Plaintiff and the cordial relationship they had enjoyed turned cold.

**A Seventh Month Strike Results in Adverse Consequences for Employees**

35.     In or about December of 2004, Defendant American Sugar employees went on strike despite Plaintiff's best efforts to negotiate a settlement (the "Strike").

36.     In January of 2006, Defendant American Sugar brought in a new union in retaliation for the Strike, and Plaintiff was no longer allowed to serve as the Union Representative.

37.     Following the Strike, Tech 2 positions were "eliminated," and the tasks previously performed by Tech 2s were performed by other employees.  Upon information and belief, the "elimination" of the position was retaliation for the Strike.

38.     Plaintiff was assigned to the position of "Store Room Attendant" in the Maintenance Department. She no longer had as many opportunities for overtime and earned far less than she had earned as a Tech 2.   Plaintiff was the only female Store Room Attendant.

39.     Despite the reduced pay and benefits, Plaintiff was relieved to be back to work after the long and painful Strike.

**Plaintiff Realizes That She's Made an Enemy of Defendant Jandovitz**

40.     Plaintiff embraced her new role as a Storeroom Attendant, and though she excelled as always, it was clear that Defendant HR Manager Jandovitz resented Plaintiff and, upon information and belief, felt that she was responsible for taking the employees out on Strike and remained angry at her for noting that he had lied during negotiations.

**Plaintiff's Seniority Amongst the Store Room Attendants Grows**

41.     Store Room Attendants take turns fulfilling weekly assignments known as "Window Work," "Inventory," "Receiving," and "Alternate."   All Store Room Attendants are required to clean their areas before and after performing their tasks and to put away the materials they have used.   Generally there was one or two overtime shifts for Store Room Attendants each weekend in the "Window Work" role.

42.     When Plaintiff became a Store Room Attendant, she was less senior than her three male co-workers, so she enjoyed very few overtime opportunities.  By about 2007, however, Plaintiff had become the most Senior Store Room Attendant and as such, enjoyed the right of first refusal for overtime opportunities, since overtime was offered by Seniority.

**Plaintiff is Blatantly Denied an Overtime Opportunity Because of her Gender**

43.     While working Window Work overtime in 2007, Plaintiff noticed that another Store Room Attendant named Regan Shepard was also working an overtime shift.  Mr. Shepard told Plaintiff that he had been called into work overtime as a "Mechanic's Helper," which was basically the same role that Plaintiff had performed as a Tech 2.

44.     Plaintiff was taken aback that Defendant American Sugar had not offered her, the most Senior Store Room Attendant, the Mechanic's Helper overtime.   In addition to preferring the work, Plaintiff believed that the overtime rate for a mechanic's helper was higher than the rate paid for Window Work Overtime.

45.     Thereafter, Plaintiff asked Defendant American Sugar to assign the Mechanic's Assistant overtime to her, but they refused, stating that the job required "too much heavy work." Plaintiff assured Defendant American Sugar that she could do the work, but she was repeatedly refused the opportunity.

46.     Plaintiff asked for the opportunity to prove she could handle the work, which was very similar to the work she had performed as a Tech 2, but she was told she could not try because she would "hurt [her] self."   Plaintiff reminded her Supervisors that she had regularly been required to fill and lift 100 pound bags of sugar on regular pay, and no one had been concerned about her safety then.  Her complaints went unanswered.

47.     Thereafter, Plaintiff was forced to perform lower paying Window Work Overtime while less senior, male co-workers enjoyed the preferable Mechanic's Assistant overtime.

48.     Plaintiff objected to the gender discrimination to Supervisor Franchot Spencer (hereinafter "Supervisor Spencer") and Supervisor Fred Pinicci (hereinafter "Supervisor Pinicci").  Supervisor Spencer and Supervisor Pinicci were unable to provide a satisfactory, non-

discriminatory explanation for Defendant American Sugar's refusal to offer Plaintiff Mechanic's Assistant Overtime.

49.     Plaintiff continued to object but was never assigned Mechanic's Assistant Overtime.

**<u>Plaintiff is Pursued and Otherwise Sexually Harassed by Her New Supervisor</u>**

50.     On or about January 21, 2008, the Maintenance Department hired Tyrone Smith (hereinafter "Supervisor Smith") as Defendants' "MRP Controller."   Supervisor Smith was tasked with supervising Plaintiff and the three male Store Room Attendants.

51.     For approximately six months, Plaintiff and Supervisor Smith enjoyed a professional relationship.

52.     In or about the summer of 2008 however, things between Plaintiff and Supervisor Smith change after he saw her in her "street clothes" as she left the plant for the day.

53.     When he saw her, Supervisor Smith expressed surprise as he had only ever seen her in a uniform.  He stated, "Oh you're a little cutie!  You look good when you clean up." Plaintiff was taken aback by the unprofessional comment.  She replied, "Thank you very much" and went about her business.

54.     Thereafter, Supervisor Smith went out of his way to sexually harass and sexually pursue Plaintiff.   He regularly made comments like, "I would take you out, you would look good on my arm" and ask "When can I take you to dinner?"

55.     Plaintiff, reluctant to offend her boss, repeatedly explained to Supervisor Smith that she did not get involved with co-workers.

56.     When he continued to pursue her, she told him that she had a boyfriend and was in a committed relationship.

57.     As Supervisor Smith continued to pursue Plaintiff despite her protestations, she began to lose patience and frequently reminded him that he had a girlfriend and a child.

58.     The more Plaintiff rejected Supervisor Smith's advances, the more strongly he pursued her.  Plaintiff became frustrated and angry.

59.     On one occasion when Supervisor Smith again attempted to ask Plaintiff for dinner, she responded, "No, I don't want to go to dinner with you.  Take your girlfriend and daughter out to dinner."  Supervisor Smith laughed meanly and walked to his office.

60.     Thereafter, Supervisor Smith's unwanted advances became even more frequent and more disrespectful.  Supervisor Smith repeatedly told Plaintiff "You know I can hit that ass the right way" and telling her that she should stop pretending that she didn't want him.

61.     Supervisor Smith also began leering at Plaintiff and attempted to make her feel uncomfortable by blatantly staring at her breasts and her other private areas.  As he frequently reported to her Supervisors, Plaintiff regularly noticed Supervisor Smith "raping her with his eyes." Plaintiff often asked Supervisor Smith to stop staring at her personal areas, saying, "My eyes are up here, please stop looking at my private areas."   In response, Supervisor Smith would laugh menacingly at Plaintiff.

62.     Supervisor Smith also regularly demanded that Plaintiff appear in his office and close the door behind her.   Plaintiff felt extremely uncomfortable and unsafe in Supervisor Smith's office with the door closed.  Supervisor Smith did not require his office door to be closed when the male Store Room Attendants were infrequently called into his office.

**Plaintiff Advises Supervisor Pinicci About the Sexual Harassment**

63.     Plaintiff soon reported Supervisor Smith's harassment to Maintenance Supervisor Fred Pinicci (hereinafter "Supervisor Pinicci").  Supervisor Pinicci was appalled to learn that

Supervisor Smith had pursued Plaintiff sexually and that he had been mercilessly retaliating against her for refusing him ever since.  Pinicci responded, "Is that boy crazy?"  Plaintiff responded, "I have told him over and over and over again that I am not interested in him, but he won't stop."  Supervisor Pinicci advised Plaintiff to ignore Supervisor Smith and stay away from him.

**Plaintiff Finally Flat Out Rejects Supervisor Smith**

64.     As Supervisor Pinicci had advised, Plaintiff tried to avoid Supervisor Smith as much as possible.  In response, Supervisor Smith angrily attempted to get Plaintiff's attention and repeatedly asked her if she was deaf.

65.     The more she attempted to ignore him, the more that Supervisor Smith bothered, harassed and pursued Plaintiff.

66.     After growing increasingly fed up, and realizing that neither being nice nor ignoring Supervisor Smith would stop his relentless pursuit, Plaintiff decided to take a different route—she told Supervisor Smith in no uncertain terms, that she did not find him attractive for several reasons and that she would not go out with him or sleep with him under any circumstance.

**Supervisor Smith Retaliates Against Plaintiff for Rejecting Him**

67.     Thereafter, Supervisor Smith initially kept his distance from Plaintiff, and she was hopeful that he would stop sexually harassing her.  Instead, he engaged in a vindictive and discriminatory pattern of retaliation against Plaintiff.

**Supervisor Smith Tells Disgusting, Humiliating Jokes in Front of and about Plaintiff**

68.     Thereafter, Supervisor Smith engaged in dirty, misogynistic joke telling and made rude and derogatory comments about females such as "She's got a big juicy ass" and "Look at the tits on this chick" when Plaintiff was in ear shot.

69.     One day, Plaintiff stated, "Please don't say those kinds of things in front of me. There is a lady present."  Supervisor Smith humiliated Plaintiff by replying, "Where at?" and implying that she was not a lady in front of the entire shop.

70.     Thereafter, Supervisor Smith's "dirty jokes" grew more frequent and more offensive.

**Supervisor Smith Makes the Cleaning Tasks the Sole Duty of the Plaintiff and Tells Plaintiff the Cleaning Tasks are Her Duty as A Woman**

71.     After she rejected him, Supervisor Smith began to order Plaintiff to do all of her co-workers cleaning tasks as well as her own. Plaintiff became the only Store Room Attendant who was required to sweep, and she was also the only Store Room Attendant ordered to clean up after other Store Room Attendants. Any and all "extra tasks" were assigned to Plaintiff, including painting and extra cleaning jobs.

72.     When Plaintiff objected to being ordered to do other people's cleaning tasks, Supervisor Smith demanded that she "stop talking back" and that it was her duty to do the cleaning in the Store Room because she was the only woman in there.   Supervisor Smith regularly made such comments to Plaintiff in front of other employees, many of whom expressed disgust and disbelief about the comments.

**Supervisor Smith Continues to Sexually Harass Plaintiff**

73.     Supervisor Smith had taken to regularly commenting on Plaintiff's body and, when she gained weight he regularly commented that her "boobs and ass" were "getting bigger."

13

Plaintiff regularly responded to such comments by saying, "How would you like it if someone spoke to your mother or your girlfriend or your daughter that way at their workplace?"

**Plaintiff Goes to Other Supervisors to Report Supervisor Smith's Behavior**

74.     In or about the fall of 2008, Plaintiff was increasingly frustrated with the sexual harassment, hostility and retaliation.   She went to other Supervisors in the Maintenance Department including Supervisor Pinicci and Supervisor Spencer and reported that Supervisor Smith was making her perform all of the cleaning tasks in the department because she was a woman.   Both Supervisors assured her that they would speak to Supervisor Smith about the discrimination, but Supervisor Smith's treatment of Plaintiff only grew worse.

75.     Although Supervisor Smith continued to yell at, ridicule and leer at Plaintiff, he stopped assigning her all of the cleaning work for about three months.

76.     Unfortunately, in or around December of 2008, Supervisor Smith started again ordering her to do cleaning work for her male counterparts. When Plaintiff objected, Supervisor Smith again told her that it was "her duty as a woman to clean."

77.     Plaintiff responded that anytime she asked for assistance for any work task she was told "equal pay, equal work" and told that she could not ask for help from her male co-workers, even though the men regularly asked each other for, and agreed to help, one another. Plaintiff asked, "So, the work has to be equal, and no one can help me, but it's my duty to do all of the cleaning because I am the woman?"

78.     Supervisor Smith yelled, "Like I said, it's YOUR job."

**Plaintiff Reports the Discrimination and Smith Retaliates**

79.     Soon, Supervisor Spencer noticed that Plaintiff was still doing all of the cleaning work in the Store Room.  In fact, it was blatantly obvious to any Defendant Employees who came through the Store Room that Plaintiff was treated differently than her male co-workers.

80.     Supervisor Spencer became annoyed and assured Plaintiff that he would again go to Supervisor Smith and take care of the problem.

81.     Later that day, Supervisor Smith confronted Plaintiff and yelled, "Oh, so you think you are off limits, huh?"  Thereafter he began treating her in an even more hostile fashion. Plaintiff realized that each time she reported Supervisor Smith, nothing happened-except that he treated her even more hostilely. Plaintiff decided that she would just accept the cleaning duty.

82.     Plaintiff decided that she was better off performing the cleaning tasks and keeping her head down since she got treated even worse when she complained.

**Supervisor Smith Begins Withholding Plaintiff's Pay**

83.     As further retaliation, Supervisor Smith failed to submit Plaintiff's overtime pay, thereby causing her to wait long periods of time for her rightful pay and forcing her to waste her valuable free time fighting for pay she had earned.

84.     Plaintiff repeatedly brought the issue to Supervisor Smith's attention and told him what was wrong and how he could easily fix it.  Supervisor Smith told her that it was [the] Payroll [Department]'s problem and that she should take it up with them.  Plaintiff went to the Payroll Department and they showed Plaintiff that Supervisor Smith had failed to put in the code required for her to get overtime on multiple occasions.  The Payroll Department also advised Plaintiff that Supervisor Smith seemed to be withholding her pay on purpose.

85.    Plaintiff also reported to Supervisor Panicci and Human Resources Assistant Manager Deborah Torche (hereinafter "HR Rep. Torche") that Supervisor Smith refused to properly pay her overtime and asked them to intervene.

86.    Thereafter, Plaintiff repeatedly asked Supervisor Smith to correct her pay issues so that she could be properly paid and he continued to ignore her, to laugh at her, to scream at her and to humiliate and punish her with extra work when she asked him to address the issue.

**Plaintiff Reports Supervisor Smith's Abuse, Discrimination and Retaliation to Defendants' Human Resources Department**

87.    When Supervisor Smith continued to withhold her pay, Plaintiff was forced to ask Human Resources Assistant Manager Deborah Torche (hereinafter "HR Rep. Torche") to fix her pay.

88.    Plaintiff reminded HR Rep. Torche that Supervisor Smith had repeatedly withheld her overtime pay and that she did not feel comfortable asking him to fix it again, because when she asked him for anything, he screamed and yelled and was "nasty" to her.

89.    She told HR Rep. Torche, "I don't trust [Supervisor Smith] to correct it, so can you please correct it, so that I can get paid the overtime pay?"

90.    HR Rep. Torche responded by asking, "But why don't you trust [Supervisor Smith]?"  Plaintiff replied, "Because he keeps doing it and he keeps lying about it.   He keeps blaming [the] Payroll [Department], but its not Payroll, and even Payroll knows he is doing it on purpose."

91.    HR Rep. Torche asked her why Supervisor Smith would purposefully make mistakes on her checks.  Plaintiff responded, "He is doing it on purpose because he doesn't like me."

92.     When HR Rep Torche asked, "Why doesn't he like you?"  Plaintiff responded "Because I don't like him."

93.     HR Rep Torche asked, "Well, why don't you like him?"

94.     Plaintiff replied, "Because he is always saying disrespectful things to me and looking at me with goo goo eyes, like he is raping me with his eyes. He makes me feel very uncomfortable and talks about my private body parts.  I try to stay away from him, but he finds reasons to look at me, scream and yell at me, harass me and violate my rights."

95.     Plaintiff reminded HR Rep. Torche that she had never had any of her other male co-workers treat her in such a disrespectful way in her twenty years with the company.

96.     Though it was very obvious that Plaintiff was alleging sexual harassment, gender discrimination, and retaliation, HR Rep. Torche failed to ask any follow up questions or further inquire into Plaintiff's allegations of wrongdoing.  She failed to ask Plaintiff any follow up questions about how Supervisor Smith "raped her with his eyes" or what Supervisor Smith did to make her feel uncomfortable.

97.     HR Rep Torche failed to inquire as to what exactly Plaintiff meant when she said that her rights were being violated and she did not ask Plaintiff what sort of disrespectful things were said to Plaintiff.

98.     Instead, HR Rep. Torche fixed Plaintiff's paycheck and said, "We will have to sit down and have a meeting."

99.     Defendant American Sugar failed to schedule a meeting thereafter.

100.    Upon information and belief, Supervisor Smith was not written up in response to Plaintiff's complaints.

101.    Upon information and belief, HR Rep. Torche reported Plaintiff's complaints and allegations of sexual harassment, gender discrimination and retaliation to Defendant HR Manager Jandovitz, but he purposefully failed to investigate the charges because he did not like Plaintiff, he failed to intercede.

102.    When no meeting had materialized and Supervisor Smith continued to harass her, it became painfully obvious to Plaintiff that Defendants had no interest in protecting Plaintiff from Supervisor Smith.

**Supervisor Smith Makes Plaintiff Paint the Office Using a Harness**

103.    Although they did not investigate the obviously illegal behavior, upon information and belief, HR spoke to Supervisor Smith about Plaintiff's payroll issues because thereafter, his behavior towards Plaintiff became even more hostile.

104.    At one point, he bizarrely ordered Plaintiff to paint almost the entire receiving room and the back rooms of the store area.   The Male Store Room Attendants were not asked to do so.

105.    When Plaintiff responded that she might need help reaching the top of the approximately fifteen foot walls, she was told to hang from a harness in order to get it done. Plaintiff had never been required to utilize a safety harness or suspend herself from the ceiling in the 20 years she had worked at Defendants American Sugar. In fact, she had never seen any employee wear a safety harness to paint by themselves either.

106.    When Plaintiff expressed reservations and told Supervisor Smith that she had no idea how to use a safety harness to hang from the ceiling, he simply growled, "Just get it done."

**Defendants' Supervisor Spencer Expresses Disgust for the Discrimination**

107.    Several employees gawked at Plaintiff as she hung from a pipe in a safety harness and tried to paint the room.  Supervisor Spencer approached Plaintiff and asked, "Why are you hanging from that ceiling pipe in a safety harness?  That does not look safe. "

108.    Plaintiff told Supervisor Spencer that Supervisor Smith had ordered her to paint the room and told her to figure out how to use a safety harness to paint the areas that she could not reach.

109.    Supervisor Spencer shook his head in disgust about the mistreatment and taught Plaintiff how to properly use the safety harness so that she would not be injured.

**Plaintiff Decides to Avoid Supervisor Smith as much as Possible**

110.    Thereafter, Plaintiff tried her best to tune Supervisor Smith out and began wearing ear plugs.  The more she disengaged from him, the angrier he got.

**Supervisor Smith Sends Plaintiff Home When She Asks Him To Correct Her Pay**

111.    Supervisor Smith began withholding Plaintiff's overtime pay again.  After he repeatedly refused to fix her paycheck, Plaintiff reminded Supervisor Smith that she did not work for free and that she wanted to be paid.  Supervisor Smith began screaming and yelling at Plaintiff for "talking back to him" and made her leave work early.

**Plaintiff Reports Smith's Harassing Behavior to HR Deborah Torche**

112.    Fearful that Supervisor Smith would try to have her fired, and upset that she was being forced to miss work and lose pay, Plaintiff called HR Rep. Torche and advised her that she had been sent home by Supervisor Smith.  HR Rep. Torche asked Plaintiff why she had been sent home.

113.    Plaintiff explained that Supervisor Smith had failed to pay her overtime yet again and was refusing to correct the mistake.  She further explained that ever since she had rejected his sexual advances, Supervisor Smith had been punishing her for refusing him.

114.    Once again, HR Rep. Torche failed to ask any follow up question about the obvious allegations of illegal discrimination and instead just focused on the payroll situation. She never followed up with Plaintiff.

115.    The following week, Plaintiff received her pay, along with a rash of hostile and retaliatory abuse from Supervisor Smith.

### Supervisor Smith Assigns Plaintiff Disproportionately More Work

116.    In addition to the blatant mistreatment, Supervisor Smith also began assigning Plaintiff far more work than the other Store Room Attendants.

117.    When assigned to Receiving, Supervisor Smith gave Plaintiff between 30 and 50 boxes to unpack.  Store Room Attendants are normally assigned 15 to 20 boxes.

118.    When assigned to Inventory, Plaintiff was ordered to complete 5 or 6 bins of inventory in one day while her male counterparts were expected to do 5 or 6 bins in two or three days.   When Plaintiff objected, Supervisor Smith replied, "Don't give me no lip, just do it."

### Supervisor Smith Continues to Punish Plaintiff by Withholding Overtime Opportunities from Plaintiff

119.    Because Plaintiff was the most senior Store Room employee, she continued to regularly enjoy Window Overtime work.

120.    While working Window Overtime on a Saturday, Plaintiff noticed that, once again, Regan Shepard, was also working overtime.  Mr. Shepard told Plaintiff that he was there performing "Firewatch Overtime."

121.     Plaintiff knew that Firewatch Overtime required assisting a welder by standing by with a fire hose, passing the welder tools and cleaning the area. She also believed that Firewatch Overtime received approximately 25% more an hour rate then the Window Overtime work. Upon information and belief, Firewatch Overtime paid $40.72, while Window Overtime paid $32.23 an hour.

122.     Because Plaintiff was senior to Mr. Shepard, she should have been offered her choice of any overtime shifts available to Store Room Attendants.

123.     Plaintiff asked if she could be assigned the higher paying work, but she was told that Firewatch Overtime required "too much heavy work."  Plaintiff replied that she was required to do heavy lifting in other positions and had always performed the work well.  Plaintiff also noted that since she was regularly required to do heavy work on straight time, she should be allowed to do it on overtime as well.

124.     Plaintiff was repeatedly told that she could not do the job because she was a woman.

125.     She stated that she believed she could do the work, but she was not allowed to. When she asked for an opportunity to show them that she could handle the work, she was told, "No, because you'll hurt yourself."

126.     Plaintiff continued to argue that she should be assigned Firewatch Overtime. Finally, Plaintiff was told that she would never be assigned Firewatch Overtime because she was a woman.

127.     When Plaintiff reported the gender discrimination to the Union Shop Stewart Fred Gaffney ("Union Stewart Gaffney"), he acknowledged that Defendant American Sugar was not

allowed to deny her overtime because of her gender.   Defendant American Sugar nonetheless refused to allow her to perform the work.

128.   Plaintiff was denied the more lucrative Firewatch Overtime solely because of her gender.

**Supervisor Smith Cuts Plaintiff Out of Overtime Opportunities**

129.   In or about Spring of 2011, Plaintiff learned that Supervisor Smith had been cutting her out of Window Overtime as well.

130.   Plaintiff only discovered the rouse when a co-worker in another department asked her where she had been on the weekends.

131.   Although it was clear that Supervisor Smith had purposefully assigned the overtime shifts to less senior employees, Plaintiff went to Supervisor Smith to tell him that he must have made a mistake.  She reminded him that she was supposed to be asked to do overtime shifts before anyone else in Store Room. She told him that she relied on overtime pay to manage her bills.

132.   Supervisor Smith responded nastily, "I can't help it if you can't manage your bills. "  Plaintiff responded, "I manage my bills just fine but I am entitled to the overtime."

133.   Supervisor Smith told Plaintiff that he did not think she should get all of the overtime.  Plaintiff responded that she had waited a very long time to be the most senior person and reminded him that she often shared the overtime shifts with her less Senior colleagues.

134.   Supervisor Smith continued to schedule other people for the weekend overtime without offering the overtime shifts to Plaintiff.

**Plaintiff Meets with HR Rep. Torche and Supervisor Pinicci**

135.    Plaintiff went to Supervisor Pinicci and said, "I have been unhappy that I wasn't entitled to [Firewatch Overtime] because I'm a woman, but I at least got [Window Overtime]. Now, I am not even getting that because [Supervisor Smith] won't assign it to me.  I am sick of the way he treats me, I am sick of being disrespected, and I just can't take it anymore." Supervisor Pinicci replied, "He's at it again?"

136.    Supervisor Pinicci took Plaintiff to have a meeting with HR Rep. Torche.  When HR Rep. Torche learned that Plaintiff was denied overtime, she responded, "Well, you are the Senior person, so why aren't you getting the overtime?"  Plaintiff replied, "Exactly, I know, but [Supervisor Smith] will not assign it to me."

137.    HR Rep Torche responded, well, since you are Senior person, you should be asked if you want any Window overtime first.  We really don't want you doing [Firewatch Overtime] because we don't want you to hurt yourself, but you should be offered Window Overtime before anyone else.

138.    Plaintiff said, "I respect your concerns, but nevertheless I am still entitled to [Firewatch Overtime], and I would like you to give me the chance to prove I can do it."  HR Rep. Torche said, "No, we do not want you hurting yourself."

139.    Plaintiff reminded HR Rep. Torche of all of the heavy lifting that she had successfully performed at Defendant American Sugar.  She noted that all she wanted was the opportunity to show that she could do the work, and if she was unable to do it, she would be the first to say it was too much for her.

140.    HR Rep Torche said, "Absolutely not, but the [Window Overtime] is yours for the taking as the Senior Store Room Attendant."

**Plaintiff Tells HR Rep that Smith Continued to Harass Her**

141.     Thereafter, the meeting ended and Plaintiff asked if she could speak to HR Rep. Torche privately.   Plaintiff told HR Rep. Torche that Supervisor Smith was still making her feel extremely uncomfortable and unsafe.   She informed HR Rep.  Torche that Supervisor Smith constantly looked at her "private areas" and licked his lips.  Plaintiff stated, "It makes me sick, and he is always doing it.  I want it stopped."

142.     HR Rep. Torche responded, "I already had a conversation with him about it before. I am going to have to talk to [Defendant HR Manager Jandovitz."

**Supervisor Smith Retaliates**

143.     Thereafter Supervisor Pinicci took charge of assigning Window Overtime so that Supervisor Smith could not punish Plaintiff with it.

144.     Supervisor Smith treated her more viciously than ever.   The following week he approached her menacingly and said, "So, you REALLY think you're off limits, huh?"

145.     Supervisor Smith continued to leer at her and lick his lips while staring at her suggestively.   He regularly made her come in his office and shut the door.  He ordered her to come around his desk and stand next to him to look at his computer screen.  He barked questions at her but when she tried to answer he told her to "shut up" because her voice was "annoying."

146.     Plaintiff regularly complained to Supervisor Pinicci about Supervisor Smith more than ten times during that time period, and Supervisor Pinicci did what he could do to protect Plaintiff from Supervisor Smith's illegal behavior.

147.     Although Supervisor Smith openly abused Plaintiff, and though she had informed them of the illegal behavior, Defendants failed to act.

**Supervisor Smith Changes the Overtime Policy To Retaliate Against Plaintiff**

148.    In or about October of 2011, Supervisor Pinicci retired. The following day, Supervisor Smith smugly approached Plaintiff and said, "[Supervisor Pinicci] isn't here anymore to protect you."

149.    Plaintiff responded, "What do I need protection from?" Supervisor Smith laughed menacingly and walked away.

150.    Thereafter, Supervisor Smith failed to offer Plaintiff Window Overtime and instead gave it to the male Store Room Attendants.

151.    Plaintiff complained to her Union Representative, Adolph McBean, ("Union Rep. McBean"), who replied, "Well, since you're the Senior [Store Room Attendant], I don't know why you are not getting the overtime. I will talk to [Supervisor Smith]."

152.    Union Rep. McBean soon reported to Plaintiff that Supervisor Smith had "changed" the policy, and that overtime was no longer offered by Seniority, but would instead be shared equally among the workers.

153.    Plaintiff responded, "Well, it's been done by Seniority for the last seven years so that is surprising to hear. But, if overtime is now going to be shared equally, than that means I am equally entitled to share Firework Overtime."

**Plaintiff Files a Grievance About the Discriminatory Overtime Assignments**

154.    Thereafter, Defendants failed to share overtime with Plaintiff. Defendants failed to punish or control Supervisor Smith, and instead allowed Plaintiff to continue to be harassed and discriminated against.

155.    Pursuant to advice from Union Rep. McBean, Plaintiff filed a Grievance.

**Supervisor Smith Hostility Deepens Against Plaintiff**

156.     Just as he had blatantly cheated Plaintiff out of overtime by changing the policy so it only adversely affected her, Supervisor Smith also began blatantly harassing, humiliating and retaliating against Plaintiff once Supervisor Pinicci retired.

**Supervisor Smith Subjects Plaintiff to an Ever Increasingly Hostile Environment**

157.     Through the early months of 2012, Supervisor Smith mercilessly sexually harassed and humiliated Plaintiff on a daily basis.  Supervisor Smith insulted Plaintiff about her age and appearance, including the following:

     a.     On February 10, 2012, SUPERVISOR SMITH called her an "Old Coon."

     b.     On February 13, 2012, SUPERVISOR SMITH said, "You have a big ass that I would tap if you weren't so old."

158.     Plaintiff reported the comments to HR Rep. Torche, who responded, "For Real? We have to have a meeting about him when [Defendant Jandovitz] comes back."  No meeting was ever scheduled.

159.     Supervisor Smith constantly made Plaintiff cry by screaming and yelling at her in 2012.  At no time did Defendants follow up with Plaintiff to see how she was faring with Supervisor Smith.  Defendants failed to punish or control Supervisor Smith, and instead allowed Plaintiff to continue to be harassed and discriminated against.

**Plaintiff Complains To Her Union Representative**

160.     Thereafter, Plaintiff informed Union Rep. McBean that "Supervisor Smith says disrespectful things to me about my body and he looks at my private areas.  He is always yelling at me and picking on me, whereas he does not mess with the guys."

161.   Union Rep. McBean responded, "Why do you think he picks on you?"  Plaintiff replied, "Because he liked me and I would not succumb to his advances."  Union Rep. McBean laughed and said that he would speak to [HR Rep. Torche] and [Defendant Jandovitz] about it.

**Supervisor Smith Assaults Plaintiff**

162.   On February 21, 2012, Supervisor Smith smacked Plaintiff on the buttocks as she walked out of his office.  Plaintiff was horrified and her eyes welled up with tears.   She told Supervisor Smith that she was going to go straight to personnel to report him.

163.   Supervisor Smith laughed in Plaintiff's face, and said, "They ain't gonna do anything, they won't even believe you."  He warned, "If you continue to report me, you know what is going to happen?"  He then started singing, "War, uh huh uh huh, war, uh huh uh huh. WAR."

**Plaintiff's Stress Levels Skyrocket from the Continued Abuse**

164.   Plaintiff thought back about the many times that she had told on Supervisor Smith and Defendant American Sugar had failed to act and she realized that Supervisor Smith was right.  She also realized that, as he had always done, he would simply treat her worse if she told on him.

165. Plaintiff began to suffer migraines and serious stomach problems.  Her symptoms were so severe and she was so upset that she felt like she was on the verge of a nervous breakdown.  Her normally upbeat personality changed and she became withdrawn. She became so depressed that her sister flew in from California unannounced to make sure she was ok and, seeing what bad shape Plaintiff was in, stayed with her for almost a year.

166.   Meanwhile, Supervisor Smith's sexual assault and retaliation continued and included the following comments:

     a.     On March 15, 2012, Supervisor Smith told Plaintiff, "Damn, what are you doing? Your boobs are getting big" while leering at her.

     b.     On March 16, 2012, Supervisor Smith told Plaintiff, "I would tell you to go fuck yourself, but you just might do it."

167.     Supervisor Smith also continued to pile work on Plaintiff and it was very clear that it was his intention to make her work life so miserable that she was forced to quit.  Plaintiff began to manifest increased physical reactions to the stress, including but not limited to ever worsening stomach problems and migraines.  Still, Defendants failed to investigate, punish or control Supervisor Smith, and instead allowed Plaintiff to continue to be harassed and discriminated against.

**Plaintiff Files Another Grievance**

168.     Since Defendant American Sugar's HR Department refused to act, Plaintiff desperately turned to Union Stewart Gaffney, who advised her that she should submit another grievance.

169.     Plaintiff told Union Stewart Gaffney that Supervisor Smith was more out of control than ever, that he was sexually harassing and otherwise discriminating against her, and that even though she continuously complained about the way he treated her, complaints were falling on deaf ears.

170.     Union Stewart Gaffney advised Plaintiff that there were no specific grievance Articles addressing Sexual Harassment but that she should file her grievance under harassment and seniority.

171.    On or about May 4, 2012, Plaintiff met with her Union Stewart Gaffney again to review the grievance she had drafted about the sexual harassment, gender discrimination and retaliation she was enduring.

172.    When Plaintiff returned to her desk from filing the grievance, she found that someone had left a fraudulent job description for the Firewatch Overtime position.   The description read that the Firewatch Overtime duty required the assigned employee to build scaffolds, to have Professional Protection Equipment training and to be fitted for a respirator mask at the hospital.

173.    Plaintiff immediately knew that the job description was a hoax, designed to fool her into believing that she was not qualified to do the work.  In fact, she knew very well that the males who regularly performed Firework did not satisfy the alleged requirements.

174.    Plaintiff took the job description to her Union Rep. McBean and told him that it had been left on her desk while she filed her grievance.

175.    Union Rep. McBean confirmed that the alleged job description was completely bogus.  He assured Plaintiff that he would advise Defendant American Sugar's HR Department about the fact that a fake job description had been left on Plaintiff's desk.

**Defendants Fail to Address Plaintiff's Grievance Until She Calls the Ethics Hotline**

176.    Plaintiff became increasingly desperate for resolution as Supervisor Smith continued to berate, humiliate, overwork and discriminate against her.

177.    Defendants continued to fail to act even in the face of a Grievance, and when they failed to respond to the grievance within 15 days, as required under the collective bargaining agreement, Plaintiff learned that there was an ethics hotline called the "Domino Direct Line" that she could call. Plaintiff was very reluctant to call the number because she was concerned of more

retaliation.   Plaintiff had never heard anyone mention the Domino Direct Line before, but she knew that she was not being helped internally and that she needed outside help.

178.  Immediately after Plaintiff's call to the Domino Direct Line, HR Manager Jandovitz agreed to meet with Plaintiff for the first time since Plaintiff had started complaining about Supervisor Smith's illegal behavior more than four years earlier.

**Plaintiff is Shocked by HR Manager Jandovitz Utter Disregard for her Allegations**

179.   On or about June 1, 2012, Plaintiff was finally invited to meet with HR Manager Jandovitz to discuss her allegations of sexual harassment, gender discrimination and retaliation.

180.   To Plaintiff's surprise, Defendant HR Manager Jandovitz was outwardly hostile to Plaintiff at the meeting and made it clear that he did not intend to help her.  Upon information and belief, in addition to holding a grudge against Plaintiff because of the 2005 strike, Defendant HR Manager Jandovitz was angry that Plaintiff had contacted the Domino Direct line.

181.   Defendant HR Manager Jandovitz began the meeting by informing Plaintiff that he "[did] not like grievances."  He also told her that he had ignored her grievance because she had not followed "proper procedure" by discussing her issues with her Supervisor before she filed a grievance.

182.   Plaintiff explained to Defendant HR Manager Jandovitz that she had talked to Supervisor Smith about his behavior dozens of times, and it was no longer possible to "talk" to him about his abusive behavior because he did not care about Plaintiff's rights.

183.   Defendant HR Manager Jandovitz interrupted Plaintiff and told her, "I don't like grievances.  Go downstairs and work it out with your Supervisor.  If you can't figure out how to resolve it, you can come back upstairs."

184.    Plaintiff was appalled that Defendant American Sugar's Human Resources Manager was forcing her to confront her own abusive tormenter.

185.    As they walked from Defendant Jandovitz's office to Supervisor Smith's office, Plaintiff advised Union Rep. McBean that she did not feel comfortable confronting Supervisor Smith about his sexual harassment without a Human Resources representative present.  Union Rep. McBean told Plaintiff that they would discuss the sexual harassment with Defendant HR Manager Jandovitz and only discuss gender discrimination with Supervisor Smith.

**Supervisor Smith Laughs When Plaintiff Notes the Discriminatory Impact of his Overtime Change**

186.    At the meeting, Union Rep. McBean informed Supervisor Smith that Plaintiff felt that she was being discriminated against because she was not being assigned Firewatch Overtime due to her gender.

187.    Supervisor Smith responded that he had changed the overtime policy and it now had to be shared.

188.    Plaintiff responded that she understood that Supervisor Smith had changed the overtime policy, but that Firewatch Overtime was still not being shared with her.

189.    Plaintiff asked, "If overtime is now shared, than why isn't the Firewatch Overtime being shared with me?"   Supervisor Smith laughed in Plaintiff's face, and responded sarcastically, "That's a good question."

190.    Union Rep. McBean advised Supervisor Smith that he had to offer Plaintiff shared Firewatch Overtime work.  Supervisor Smith just laughed.

**Supervisor Smith Smugly Admits That He Put the Hoax Job Description on Plaintiff's Desk**

191.    During the meeting, Plaintiff also asked, "Who left the job description on my desk today after so many months of me asking for Firewatch Overtime?"

192.    Supervisor Smith laughed again and bragged that he and the Pipefitting Supervisor had left the hoax job description on Plaintiff's desk to dissuade her from trying to get Firework Overtime.

**Defendant HR Manager Jandovitz Avoids the Harassment Grievance**

193.    When they returned to Defendant Human Rights Manager Jandovitz' s office, he asked, "Were you able to resolve everything?" Union Rep McBean reported that Supervisor Smith said that Store Room Overtime would be shared.

194.    When Defendant Human Rights Manager Jandovitz declared the situation to be resolved, Plaintiff stated, "But he is not going to give me Firewatch Overtime. Defendant Human Rights Manager Jandovitz replied, "Well, you can't pick and choose your overtime."

195.    Plaintiff replied that she should share both types of overtime as her male co-workers did.  Defendant Human Rights Manager Jandovitz told Plaintiff that the overtime was resolved as shared and she assumed that she would now share in Firewatch Overtime.

196.    Union Rep. McBean also advised Defendant Human Rights Manager Jandovitz that Supervisor Smith had admitted placing a bogus job description for Firewatch duty on Plaintiff's desk and that he had laughed about it.

197.    Defendant Human Rights Manager Jandovitz shook his head in disgust, and said, "I can't believe he really did that."  Plaintiff replied, "This is what I am dealing with all of the time."  Still, Defendants failed to investigate the allegations, failed to punish or control Supervisor Smith, and forced Plaintiff to continue to be harassed and discriminated against.

198.    Defendant Human Rights Manager Jandovitz then said, "Ok. Now let's talk about this harassment" and Plaintiff immediately started to pull out the many notes that she had brought to the meeting.  Defendant Human Rights Manager Jandovitz responded, "Oh, that is too many notes.  We'll have to reconvene on Monday."

199.    Plaintiff waited for Defendant Human Rights Manager Jandovitz to call for her on Monday, as was required for her to leave her post, but he never did and Plaintiff was forced to return to increasingly hostile conditions.

**Supervisor Smith Retaliates Against Plaintiff for Reporting Him**

200.    When Plaintiff returned to work on Monday, Supervisor Smith was bitterly angry at Plaintiff and followed her around the office screaming and yelling at her.   Supervisor Smith assigned Plaintiff an overwhelming amount of work that was simply impossible for one person to perform in an eight hour shift and then harassed her about the work the entire time, telling her that she was "moving too slow" and to "shut her mouth and hurry up and do it."

**Plaintiff Suffers an Anxiety Attack**

201.    Plaintiff's anxiety levels rose through the week.  She was suffering from migraine headaches, stomach pains and chest pains.  On Wednesday June 6, 2012, she suffered a panic attack while Supervisor Smith was attacking her. She started crying and told him that she had to leave to go to the Doctor.  He replied nastily, "You better come back with a doctor's note."

202.    Plaintiff bumped into Manager Elizabeth Madonca ("Manager Madonca"), who was aware of the way that Supervisor Smith treated Plaintiff.   Manager Madonca noticed that Plaintiff was sobbing and asked her what was wrong.   Plaintiff responded, "It's still that doggone [Supervisor Smith].  Manager Madonca responded, "What did he do now?"  Plaintiff

replied, "He is just worse than ever."   Manager Madonca responded, "He is out of control." Plaintiff replied, "I know, and they just won't do anything."

**Plaintiff is Put on Medical Leave**

203.    Plaintiff visited the doctor that day.  She was told that she was suffering from extreme depression from her work related issues and that she could not return to work until the doctor cleared her to do so.   She was put on medication and ordered to see a psychiatrist. She was cleared to return to work on August 13, 2012.

204.    On or about August 6, 2012, Plaintiff wrote to Defendants about her upcoming return:

> On June 6, 2012 I was taken out of work and placed under doctor's
>
> care due to medical issues resulting from stress at work.  I have
>
> been released by my doctor and will be returning to work on
>
> Monday, August 13, 2012.  For my health and well-being I'm
>
> requesting to return to a work environment free of stress, sexual
>
> harassment and discrimination.

**Plaintiff's Return Meeting with HR**

205.    Upon her return to work, Plaintiff was called to Defendants' Human Resources office.  Instead of asking her how she was feeling or welcoming her back, Defendant Human Rights Manager Jandovitz snapped, "How did you get this August 9 letter to me?"

206.    Plaintiff replied, "I would think you would be more concerned about the contents in the letter, not about how I got it to you."

207.    Defendant Human Rights Manager Jandovitz responded, "Oh. Well it has no postmark on it."  Then, still holding the letter he asked, "What do you consider a stress free

34

environment?"   Plaintiff responded "Sexual harassment free, gender discrimination free, and retaliation free."

208.   Defendant Human Rights Manager Jandovitz replied, "Oh. Well, why didn't you report the sexual harassment [before May 4, 2013]?"

209.   Plaintiff replied, "I did report it before then."

210.   Instead of inquiring further, Defendant Human Rights Manager Jandovitz asked Plaintiff if she wanted to work in a different department.  Plaintiff replied "No.  I can't afford to go to a different position, because I have unlimited overtime in my position.  Plus, I would have to do rotating shiftwork instead of the day shift if I took a different shift, or get paid less, and I can't do that."

**Supervisor Smith Continues to Abuse Plaintiff**

211.   Initially upon her return, Supervisor Smith was on his best behavior, although he still refused to assign Plaintiff Firewatch Overtime.

212.   By mid-September however, Supervisor Smith began relentlessly harassing Plaintiff again and regularly screamed at and harassed her through September and October. Defendants allowed Plaintiff to continue to be harassed and discriminated against.

**Plaintiff Files a Complaint with the EEOC**

213.   On or about September 7, 2012, Plaintiff sought counsel from family, friends and her therapist.  They convinced her that she had to file a complaint with the EEOC or quit her job for the sake of her health.  Because she could not afford to quit her job, Plaintiff decided to file a Complaint with the EEOC.   She alleged gender discrimination, sexual harassment, and retaliation.

35

214.    Word quickly spread throughout Defendants' factory that Plaintiff had filed a complaint against Defendant American Sugar and many of her co-workers stopped speaking to her.

215.    Supervisor Smith began treating Plaintiff even more hostilely.   On or about October 18, 2012, Supervisor Smith told Plaintiff to go take a required hearing test.  The testing session was full and Plaintiff was told to return for her test later. She returned to work. Supervisor Smith saw her and began screaming, "Didn't I tell you to go take your fucking hearing test? You think you can always do what you want around here.  Just do what I fucking said."  Supervisor Smith would not allow Plaintiff to explain why she was not able to take the hearing test at that time.

**Plaintiff Breaks Down and Agrees to a Temporary Demotion to Escape Supervisor Smith**

216.    Plaintiff went to HR Rep. Torche and reported what had happened.  She stated that she could not bear to work with Supervisor Smith any longer.

217.     HR Rep. Torche called Defendant Human Rights Manager Jandovitz into her office and repeated what Plaintiff had told her.

218.    Defendant Human Rights Manager Jandovitz replied, "Well, do you want to transfer out of the department?"  They suggested that she go to Sanitation. Plaintiff was shocked that Defendants would move her to a less desirable position because Supervisor Smith was abusing her, and responded, "I can't afford to [take a lower paying job]."

219.    Defendant Human Rights Manager Jandovitz replied, "Well, if you do it for two weeks the issue with Supervisor Smith will be resolved."  Plaintiff, believing that Supervisor Smith would finally be removed from his position because of his illegal behavior responded, "Well, if it's only for two weeks, I will do it for two weeks."

220.    Defendant Human Rights Manager Jandovitz said, "Ok, I want you to put it in writing that you want a two week transfer."

221.    Plaintiff replied, "I will put it in writing so long as it's for two weeks only." Defendant Human Rights Manager Jandovitz handed Plaintiff a pen and directed her to write, "To Whom It May Concern, I Rosanna Mayo-Coleman would like to transfer to sanitation for two weeks for my health reason.  I can no longer work with Tyrone Smith."

**Plaintiff Performs Sanitation Duty**

222.    The following week, Plaintiff reported to Sanitation Duty.   However, the following week, Hurricane Sandy happened and Plaintiff was told that she could not work while Supervisor Smith and all of her co-workers received copious amounts of overtime.  HR refused to allow Plaintiff to come in and she received no pay.

**Supervisor Smith Remains on the Job; Plaintiff's Co-Workers Ostracize Her**

223.    When Plaintiff returned to the Store Room after two weeks, Supervisor Smith had not been terminated or even punished.  Instead, he was left in the Store Room to continue to harass and discriminate against Plaintiff, as he had always done.  Still, Plaintiff tried to be a team player because of the overwhelming havoc that Sandy had caused at the plant and for many of her coworkers, but Supervisor Smith immediately started berating her, abusing her, humiliating her and denying her overtime.

224.    Plaintiff took to wearing earplugs so that she did not hear Supervisor Smith's abuse while she did her work.  Supervisor Smith would scream and yell at her for using the earplugs.

225.    Defendants failed to contact Plaintiff to inquire as to how she was being treated after her return to work.  On one occasion, Plaintiff ran into Defendant Human Rights Manager

Jandovitz in the parking lot and he asked her, "How's it going?"  Plaintiff responded dejectedly, "It's going exactly the same as before."  Defendant Human Rights Manager Jandovitz just walked away and, though he knew the illegal behavior continued, he failed to act.

**Supervisor Smith Continues to Abuse Plaintiff on A Daily Basis**

226.    Supervisor Smith continued to subject Plaintiff to his hatred and ridicule on a daily basis.  He continued to over-assign her work, make her do all of the cleaning, curse at her, insult her, call her names and deny her overtime.

**November 13, 2013 Smith's Employment Finally Ends**

227.    On or about November 13, 2013, almost a year after she had finally filed a complaint with the EEOC, Plaintiff learned that Supervisor Smith would no longer be working with the Company.  It is unclear whether Supervisor Smith was fired or quit.  Thereafter, Defendants continued to deny Plaintiff overtime opportunities based on her gender.

228.    A few weeks later, Defendant Human Rights Manager Jandovitz called Plaintiff into his office and said, "Now that Smith is no longer there, things are better, right?  Plaintiff replied, "Well in terms of respect things are better."  He replied, "So everything is fine now?  Plaintiff replied, "No, it's not fine. They still refuse to share [Firewatch Overtime] with me."

229.    Defendant Human Rights Manager Jandovitz then stared at Plaintiff until she felt so uncomfortable that she excused herself from his office and left.  Upon information and belief, Defendant Human Rights Manager Jandovitz hoped that he could intimidate her into withdrawing her EEOC Complaint as he had done more than twenty years earlier.

230.    Thereafter, Defendant Human Rights Manager Jandovitz never spoke to Plaintiff again and would instead turn the other way when he saw her.

**Plaintiff Commences the Instant Lawsuit**

231.    On or about January 6, 2014, Plaintiff filed the instant lawsuit for the years of sexual harassment, gender discrimination and retaliation that she endured despite her repeated complaints to Human Resources.

**Plaintiff Successfully Completed a Firewatch Overtime Shift**

232.    On or about March 9, 2014, Plaintiff was finally offered Firewatch overtime for the first time. Despite anger and hostility from a male supervisor, she performed the job well.

233.    On or about April 19, 2014, Plaintiff was again offered Firewatch Overtime.  She was charged with an outrageously difficult task which was clearly designed to cause her to fail, but she successfully completed the task.

234.    Plaintiff has not been continuously denied Firewatch Overtime since April 19, 2014.

## AS AND FOR A FIRST CAUSE OF ACTION

235.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "234" as if set forth herein.

236.    Plaintiff is an African-American female over the age of 40 (at all relevant times) and is therefore a member of a protected class under 42 U.S.C. §§ 2000 et seq.

237.    Plaintiff was and is qualified to work as an employee for Defendants and she was able to satisfactorily perform the duties required by the position she held and sought at Defendant American Sugar.

238.    Defendants subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions because of her gender, sex, race and age.

239.    By reason of Defendants' violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

240. As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A SECOND CAUSE OF ACTION

241. Plaintiff Repeats and realleges each and every allegation contained in paragraphs "1" through "240" as if set forth herein.

242. Plaintiff is an African-American female over the age of 40 (at all relevant times) and is therefore a member of a protected class under the New York State and City Human Rights laws.

243. Plaintiff was illegally discriminated against because of her gender, sex, race and age when Defendants regularly made employment decisions adverse to Plaintiff because of her gender, sex, race and age.

244. The gender, sex, race and age discrimination Plaintiff suffered while employed at Defendants was severe and pervasive, unwelcomed by Plaintiff, and would be offensive to a reasonable person.

245. The gender, sex, race and age discrimination that Plaintiff suffered while employed at Defendants severely affected the terms and conditions of her employment, as set forth in detail here and above.

246. Plaintiff repeatedly reported the discrimination to Defendants' Management Personnel and HR Department and was repeatedly witnessed by Defendants' Management

Personnel and employees.   Therefore, Defendants knew or should have known about the discrimination and the effect it had on Plaintiff's employment.   Yet, Defendants failed to take the necessary remedial actions.

247.   As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

248.   As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

249.   Plaintiff was discriminated against and subjected to gender, sex, race and age discrimination that created a hostile work environment by Defendants based on her race, skin color, gender and/or sex in violation of the New York State and City Human Rights Laws.  As a result of Defendants' violation of the New York State Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,500,000.

## AS AND FOR A THIRD CAUSE OF ACTION

250.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "249" as if set forth herein.

251.   Plaintiff became an employee of Defendants in 1988 and as such is protected by the New York State and City Human Rights Laws from retaliation and retaliatory discharge.

41

252.    Plaintiff repeatedly complained to Defendants and/or Defendants' management regularly witnessed the severe and pervasive race, gender, sex, and age discrimination and hostile work environment she was subjected to during her employment with Defendants.

253.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants' managerial and Human Resource employees in violation of New York State and City Human Rights laws as well as, upon information and belief, Defendants' own internal policies.

254.    Plaintiff notified Defendants' Management of the severe race, gender, sex, and age discrimination and hostile work environment she was subjected to and protested the harassment and the fact that Defendants' Management failed to act responsively.

255.    Plaintiff's protest to Defendants about the severe and pervasive race, gender, sex, age discrimination, and hostile work environment she was subjected to during her employment with Defendants was a protected activity under the New York State and City Human Rights Laws.

256.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race, gender, sex and age discrimination and hostile work environment.

257.    Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment.

258.    Because she protested Defendants' unlawful behavior, Plaintiff was demoted, denied promotions, denied overtime opportunities, forced to take on extra work and humiliated.

259.    The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of Federal Law as well as New York State and City Human Rights Laws.

260.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory constructive discharge.

261.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due her.

262.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

263.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

264.    Plaintiff was discriminated and retaliated against and suffered a retaliation in violation of Federal Law as well as New York State and City Human Rights Law. As a result of Defendants' violation of Federal law, New York State and New York City Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,500,000.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)     On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $1,500,000;

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $1,500,000;

(iv)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.


**Dated: New York, New York**
      **July 28, 2014**

                              **NESENOFF & MILTENBERG, LLP**
                              **Attorneys for Plaintiff**


                              **By:_____/S/_____**
                                     **Megan S. Goddard, Esq.**
                                     **363 Seventh Avenue, Fifth Floor**
                                     **New York, New York 10001**
                                     **(212) 736-4500**

**TO:**   **Carol J. Faherty**
          **Ivey, Barnum & O'mara, LLC**
          **170 Mason Street**
          **Greenwich, Connecticut 06830**
          **cfaherty@ebglaw.com**

          **David Seth Poppick**
          **Epstein, Becker & Green, P.C. (Stamford)**
          **One Landmark Square**
          **Stamford, Connecticut 06901**
          **dpoppick@ebglaw.com**