UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ROSANNA MAYO-COLEMAN,

                              Plaintiff,

                       - v. -

AMERICAN SUGARS HOLDING, INC., AND BOB JANDOVITZ

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 14-cv-0079 (PAC)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE*

### PRELIMINARY STATEMENT

Defendant American Sugars Holding, Inc. ("Defendant" or "ASH")[1] hereby submits this Memorandum of Law in support of its *Motion In Limine* that seeks a ruling: (1) precluding the proffered expert psychiatric testimony of Robert Goldstein, M.D. ("Dr. Goldstein) pursuant to Fed. R. Evid. 702 and 403; and (2) precluding Plaintiff's introduction of evidence and testimony regarding certain traumatic personal events in her life, which occurred many years before the events alleged in the amended complaint ("Complaint") and which are unrelated to her employment with Defendant.

### FACTUAL SUMMARY

In the Complaint, the "First Cause of Action" alleges that Plaintiff was subjected to an atmosphere of adverse employment actions and a hostile work environment based upon her gender, sex, race and age in violation of Title VII of the Civil Rights Act of 1964. The "Second Cause of Action" alleges Plaintiff was discriminated against based upon her gender, sex, race and age in violation of New York State and City Human Rights Laws. The Third Cause of

---

[1] The claims against Bob Jandovitz have been dismissed. (Docket No. 137).

Action alleges Plaintiff was discriminated against based upon her race, gender, sex and age, and suffered retaliation in violation of federal law and New York State and City Human Rights Laws. The Complaint listed a variety of alleged events that Plaintiff claimed were motivated by one or more of her protected personal characteristics, such as failure to be given overtime, assignment of less favorable duties, alleged sexual harassment by her supervisor and retaliation. On September 18, 2017, Judge Crotty issued an opinion and order dismissing Plaintiff's claims of race, age and gender-based discrimination and retaliation from the case.[2] (Docket No. 137). All of Plaintiff's claims under New York City Human Rights Law were also dismissed. As a result, the only remaining claim in the case is Plaintiff's claim of a sexually hostile work environment.

Plaintiff's claim of a hostile work environment stems from alleged sexual harassment by her then-supervisor, Tyrone Smith, over a limited period of a few months in 2012. Plaintiff alleges that as a result of the alleged hostile work environment, which she admitted lasted from February to May, 2012, and ended before Smith separated from the Company in May 2013, she has and continues to this day suffered extreme emotional distress and mental anguish, the onset of persistent psychiatric symptoms and stress-related medical conditions.

In support for her damages claim for mental distress, and pursuant to Fed. R. Civ. P. 26, Plaintiff intends to call Dr. Goldstein as an expert witness, who will presumably testify consistent with his expert witness report (the "Goldstein Report,") which purports to set forth Dr. Goldstein's opinion as to the cause of Plaintiff's emotional distress and mental anguish.[3] Defendant hereby moves to preclude such testimony on the ground that it is not reliable and fails to meet the standards for expert testimony set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

---

[2] The race and age claims have been dismissed from this case pursuant to the Court's ruling adopting the Report and Recommendation of Magistrate Nathaniel Fox on July 17, 2015.

[3] A copy of the Goldstein Report is annexed as Exhibit A to the accompanying declaration of Kenneth J. Kelly ("Kelly Dec.").

Firm:44801725v1

Dr. Goldstein's deposition was taken on June 1, 2016.[4] Therein he testified that he interviewed Plaintiff on only one occasion on October 13, 2015 for approximately two hours. (Goldstein Dep. Tr. P. 33, L. 3). In forming his opinions, Dr. Goldstein also reviewed a report dated December 9, 2014 entitled "Psychiatric Evaluation for Adults" and "Diagnostic Review" prepared by a Dr. Gudis at the Riverdale Mental Health Association (the "Riverdale Record"), where Plaintiff had presented on December 9, 2014. Dr. Goldstein also read the transcript of Plaintiff's deposition in this action.

Plaintiff is now 59 years old and is still employed at ASH. With respect to Plaintiff's background, Dr. Goldstein's Report states that Plaintiff's parents divorced when she was ten years old and thereafter she only had sporadic contact with her father. (Report. p. 2). Her father died in 1980 from cancer. (Id.). Her brother died of a heart attack in 2002. (Id.) Her mother died in 2008 from cancer. (Id.). Plaintiff was very close with a sister who died suddenly of a ruptured cerebral aneurysm in 2013. (Id. p. 4) The Report also noted that Plaintiff was sexually molested in adolescence when she was raped by a friend of the family at age 14. (Id. p. 2). She had no psychiatric treatment at that time. Dr. Goldstein testified that he relied heavily on the Riverdale Record in rendering his expert opinion.

There are a number of additional facts about Plaintiff's background referenced in the Riverdale Record and about which Dr. Goldstein testified, yet are absent from his Report. As a result of the rape at age 14, Plaintiff had an abortion which she thinks made her unable to have children. (Dep. Tr. P. 113, L. 17 – P. 114, L. 3). Plaintiff also attempted suicide in 2000 by taking pills but was found by her sister. (Id. P. 115, L. 12 – P. 116, L. 6). The Riverdale Record notes that following Plaintiff's suicide attempt, she had brief psychiatric treatment in 2012 and was on Zoloft[5] for six months, which she reported was helpful, but she stopped treatment after

---

[4] A copy of the transcript of Dr. Goldstein's deposition is annexed as Exhibit B to the Kelly Dec.
[5] Zoloft is used to treat Major Depressive Disorder. See https://www.zoloft.com/about-zoloft

Firm:44801725v1

several months. In addition, Plaintiff had recently broken up with her boyfriend after a 12-year relationship. (Id. P. 105, L. 4-14).

Dr. Goldstein concluded that as of October 2015, Plaintiff suffered from "Major Depressive Disorder" which he opined is "directly and causally related to the traumatic emotional stress associated with what she has perceived as gender, race, color and age discrimination, sexual harassment, a hostile work environment, and retaliation at American Sugars." (Report at p. 6). Despite the significant additional stressors in Plaintiff's life, Dr. Goldstein concluded that prior to the sexual harassment and other perceived discriminatory acts, Plaintiff was not suffering from a diagnosable psychiatric condition. This conclusion is a non-sequitur, since it was based on the fact that Plaintiff "was never diagnosed by any mental health professional as suffering from a psychiatric condition" and there was no such diagnosis because she never sought any mental healthcare. (Dep. Tr. P. 54, L. 2-15). Dr. Goldstein cannot logically opine that Plaintiff was not suffering from any pre-existing condition simply because she never sought treatment. However, Dr. Goldstein testified that Plaintiff was accurately diagnosed as having a Major Depressive Disorder at Riverdale and that its findings were consistent with his findings. (Dep. Tr. P. 110 L. 16 - 21; P. 112, L. 5-24).

As described more fully below, the Goldstein Report's analysis rests on shaky assumptions and conjecture that defy common sense, are inconsistent with the facts, and rely on unreasonable speculation, culminating in an opinion that is not supported by any medical or scientific methodology. Dr. Goldstein will not offer reliable assistance to the jury at trial. To the contrary, if Dr. Goldstein were permitted to testify consistent with his Report, with the apparent imprimatur of an expert, his testimony would be highly and impermissibly prejudicial to ASH.

## APPLICABLE *IN LIMINE* PRINCIPLES

The purpose of an *in limine* motion is to "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996). When a party files an *in limine* motion, "the court is required to determine preliminarily under Fed. R. Evid. 104 whether the evidence is admissible." Spencer v. Int'l Shoppes, Inc., No. 06-cv-2637 (AKT), 2013 U.S. Dist. LEXIS 25524, at *3 (E.D.N.Y. Feb. 25, 2013) (citing Highland Capital Mgmt., L.P. v. Schneider, 379 F.Supp.2d 461, 467 (S.D.N.Y. 2005)).

A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*. See Luce v. United States, 469 U.S. 38, 41 n.4 (1984). Indeed, "[t]he purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted); see also Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01 Civ, 3796, 2005 U.S. Dist. LEXIS 7902, at *9 (S.D.N.Y. May 2, 2005).

## ARGUMENT

### POINT I

### PLAINTIFF SHOULD BE PRECLUDED FROM OFFERING TESTIMONY AND THE EXPERT REPORT OF DR. GOLDSTEIN

    A.    **Plaintiff's Damages Expert Should Be Excluded Under Fed. R. Evid. 702 and *Daubert***

Dr. Goldstein's proposed testimony and analysis, as described in the Goldstein Report, is so fundamentally flawed and unreliable that his testimony should be excluded in its entirety under both Fed. R. Evid. 702 and Evid. 403. Conceding that "whether the facts she alleges are

- 5 –

true or not is not my province" (Dep. Tr. P. 98, L. 4-6), Dr. Goldstein took what Plaintiff told him during their single two-hour meeting at face value, without the benefit of appropriate measures designed to validate her assertions. He did not consult with anyone from Riverdale or any other medical provider. Dr. Goldstein also failed to learn about other major stressors in Plaintiff's life that could have contributed to her depression, let alone weigh those other stressors. Significantly, Dr. Goldstein also did not perform the necessary testing to measure Plaintiff's symptoms, and he did not administer any instruments designed to qualify or quantify the extent of her impression management. Stated simply, Plaintiff has not met her burden to show that Dr. Goldstein's proffered testimony regarding damages is reliable (because it is not).

Admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Beginning with its landmark decision in Daubert, supra, the United States Supreme Court has provided substantial guidance regarding the admissibility of expert testimony. See also Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997). In assigning to the trial judge the task of "gatekeeper" to ensure that an expert's testimony rests on a reliable foundation and is relevant to the task at hand, the Court in Daubert explained that the trial judge must screen such evidence to "ensure that any and all scientific expert testimony or evidence admitted is not only relevant, but reliable," and established a two-prong test for admissibility. See Daubert, 509 U.S. at 589-592.

The threshold question under <u>Daubert</u> is whether proffered expert testimony meets a standard of evidentiary reliability, and focuses the judicial inquiry on scientific methodology. <u>See</u>, 509 U.S. at 589-591. The second part of the courts' function is to assess relevance, which requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility, and is otherwise known as the "fit" test. See <u>Daubert</u>, 509 U.S. at 591-592. Thus, <u>Daubert</u> instructs courts to focus not on the substance of the conclusions, but on whether the experts' opinions were generated by a reliable methodology. See <u>Daubert</u>, 509 U.S. at 590, 595. The gatekeeping function assigned in <u>Daubert</u> applies with equal force to proposed testimony based on non-scientific knowledge, such as technical or other experts, and the trial judge should apply a "flexible" test of reliability. <u>Kumho Tire</u>, 526 U.S. at 141; <u>Zaremba v. Gen. Motors Corp.</u>, 360 F.3d 355, 358 (2d Cir. 2004). If the Court finds that the Plaintiff's expert testimony fails either of these tests, it should preclude the witness's testimony.

Dr. Goldstein's proposed testimony, as contained in the Goldstein Report, does not come close to satisfying the standards set forth in <u>Daubert</u> and its progeny. Dr. Goldstein relied exclusively upon what Plaintiff told him as to what she thought caused her distress, and he ignored other alternative causes of Plaintiff's alleged emotional distress of which there were many. Furthermore, he provided no reasonable explanation for dismissing specific alternative factors, such as the sudden 2013 death of her sister (which the Riverdale Report mentions a half-dozen times), rape as a child (which Plaintiff claimed was reawakened by the sexual harassment by Smith). He simply adopted the diagnosis from the 2012 Riverdale Report, which did not refer to Plaintiff's complaint that she was being sexually harassed by her supervisor. (Dep. Tr. P. 110, L. 16-21). Plaintiff simply reported to the Riverdale physician that she was undergoing <u>unspecified</u> "stressful issues at work." Neither sexual harassment nor discrimination on any basis is mentioned in the Riverdale Report. The diagnosis from Riverdale of Major Depressive

- 7 –

Disorder was not based upon alleged sexual harassment by her supervisor, yet Dr. Goldstein concludes that the alleged sexual harassment in 2012 and other discrimination was most upsetting and distressing to Plaintiff and which led to Plaintiff's depression. (Dep. Tr. P. 46).

When the expert "lacks 'good grounds' for his" conclusions, the evidence should be excluded. Amorgianos v. Nat'l Railroad Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). Dr. Goldstein's Report does not contain good grounds for his conclusions. Therefore, his report and testimony should be precluded entirely.

### B. Plaintiff's Expert Report Does Not Satisfy Daubert On Issues Of Causation Of Plaintiff's Emotional Distress

Dr. Goldstein's Report concludes that a "substantial cause" "in and of itself," of Plaintiff's emotional distress is the perceived "gender, race, color, and age discrimination, sexual harassment, a hostile work environment and retaliation" at American Sugar. Dr. Goldstein's opinion cannot be deemed reliable because he failed to perform a meaningful differential diagnosis to explain why Plaintiff's depression is attributable to her workplace stressors at American Sugar, when she had other significant stressors within reasonable proximity to the 2012 – 2015 period. Therefore, Dr. Goldstein's Report does not satisfy the Daubert standards.

A "differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the 'most likely' case if a set of signs and symptoms from a list of possible causes." Ruggierio v. Warner Lambert Co., 424 F.3d 249, 254 (2d Cir. 2005). To the extent an expert report touches on matters of causation, it will satisfy Daubert's prerequisites for reliability only if the doctor "conducted a meaningful 'differential diagnosis' ruling out other possible contributing factors." Munafo v. Metropolitan Trans. Auth., 2003 U.S. Dist. LEXIS 13495, *55 (E.D.N.Y. Jan. 22, 2003). ("When offered for the purpose of proving specific medical causation, a meaningful or reliable differential diagnosis must specifically negate other possible alternative causes."). If an expert "utterly fails to consider alternative causes or fails to

Firm:44801725v1

offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." Derienzo, 694 F. Supp. 2d at *239; Cooper v. Smith & Nephew, Inc. 259 F.3d 194, (4th Cir. 2001).

When the cause of claimed emotional harm is at issue, it is critical for an expert to account for, and reasonably rule out, obvious alternative sources before the causation testimony can be deemed reliable. Munafo, at *52 (ruling on a challenge to expert testimony regarding the cause of plaintiff's depression the Court opined that "[w]hile an expert need not rule out *every* potential cause in order to satisfy Daubert, the expert's testimony must address at least obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant"). In Munafo, the Court found that the expert was not reliable when he failed to perform a thorough and meaningful differential diagnosis and could not give satisfactory reasons for discounting contributing factors to the plaintiff's depression, such as his mother's murder, father's cancer diagnosis, possible mental illness, and his divorce.

Here, Dr. Goldstein's opinion cannot be deemed reliable because he could not provide a reasonable explanation why he dismissed alternative factors that could have caused Plaintiff's emotional distress, such as reawakened memories of a childhood rape and the death of three family members, including the sudden death of her favorite sister. Dr. Goldstein admitted that Plaintiff's sister's sudden death in 2013 was "definitely" a contributing factor to her stress and was an "emotional blow" to Plaintiff. (Dep. Tr. P. 52, L. 4-25). He also testified that Plaintiff's sexual assault at a young age did play a role in her subsequent depressive disorder. (Id. P. 57, L. 13-16). Additionally, Dr. Goldstein testified that the fact that Ms. Mayo Coleman became pregnant as a result of the sexual assault, received an abortion that she suspected made her unable to have children later in life, would predispose her to depression. (Id. P. 115, L. 2-7). However, Dr. Goldstein inexplicably concludes that it would not cause a depression 40 years

later. Id. Additionally, he concluded that Plaintiff's suicide attempt in 2000 was not an indicator of a depressive disorder. (Id. P. 115, L. 12 - P. 116, L. 14).

In Munafo, the Court also found it troubling that the expert's diagnosis was based entirely on the plaintiff's own description of his symptoms and the Plaintiff's own opinions as to the causal relationship between his anxiety and work-related difficulties. The expert admitted that he just "just took what [plaintiff] said…and didn't explore" or probe the plaintiff's descriptions of symptoms or contact his other physicians. The expert in Munafo also failed to perform any tests to rule out other causes of the plaintiff's depression. Munafo, at *57. For all these reasons, the Court found that the report lacked "scientific rigor" and was therefore unreliable on the issue of causation. Id., at *61.

This case is remarkably similar to Munafo. In diagnosing Plaintiff, Dr. Goldstein relied exclusively on what Plaintiff told him and what was contained in the Riverdale Record, which itself is merely a recital of Plaintiff's own narrative and indicates that Plaintiff reported to Riverdale "stressful issues at work- longstanding poor treatment by management which worsened in 2012 when [she] started a grievance procedure." (Riverdale Report at P. 3). He concededly did not conduct any independent investigation to ascertain the cause of Plaintiff's reported stress or depressive symptoms, or even whether Plaintiff's assertions of fact were true. Indeed, he testified that truth or falsity was irrelevant to him: ". . . I couldn't conclude one way or the other whether they were true or false, I just regarded then as what she was relating, in terms of what she perceived at the time." (Dep. Tr. P. 47, L. 5-9).

Dr. Goldstein further admitted that he did not contact the Riverdale Clinic or the doctor who prescribed Plaintiff Zoloft. (Dep Tr. P. 84, L. 13 - P. 86, L. 2). He also admitted that he did "no specific test" regarding a differential diagnosis. (Id. P. 109, L. 6-8). This is certainly no

- 10 –

basis on which to state the conclusion that the "cause" of Plaintiff's depression was the work environment at ASH.

Because Plaintiff was already diagnosed as having major depressive disorder by Riverdale in 2014, Dr. Goldstein concluded that the other factors did not contribute to Plaintiff's condition. (Id. P. 109, L. 25 - P. 110, L. 21). Dr. Goldstein did not rule out sources of Plaintiff's stress and depression that are unrelated to her employment. For example, Plaintiff reported that she was raped and had an abortion as a result, which she believes ultimately rendered her unable to have children. Furthermore, psychiatric records from Riverdale indicate that Plaintiff was possibly suicidal and took an overdose of pills in 2000, years before the alleged harassment and discrimination by Tyronne Smith. In addition, Plaintiff experienced additional stressors such as her brother's sudden death in 2002, her mother's death in 2008 and the sudden death of her sister in 2013, and the termination of a personal relationship. Dr. Goldstein's report dismisses the potential cumulative impact of all of these losses on Plaintiff and whether they could have led to her depression, but does not even attempt to explain why.

There is no evidence that Dr. Goldstein engaged in a meaningful differential diagnosis before concluding that "a substantial cause" of Plaintiff's depression, standing alone, was her employment at American Sugar. To the extent Plaintiff may have had depressive symptoms at the time of her evaluation by Dr. Goldstein, he fails to opine with any degree of medical certainty that Plaintiff's traumatic past and cumulative losses of family members between 2002 and 2013 does <u>not</u> contribute to her distress. This is not a question of credibility to be determined at trial, but a question of intrinsic reliability based on the absence of a critical element of psychological analysis.

### C. Dr. Goldstein Failed To Follow Standard Methodology In Rendering His Opinion

In addition to failing to perform a basic differential diagnosis, Dr. Goldstein failed to follow the typical methodology used by experts to form a reliable psychiatric opinion. Such methodology includes "personal interviews, medical record review, clinical rating scales and a background of facts and past symptoms, behaviors and experiences." Israel v. Springs Indus., 2006 U.S. Dist. LEXIS 80863, at *38 (E.D.N.Y. Nov. 3, 2006). See also Tachat v. City of New York, 315 F.R.D. 441, 444 (S.D.N.Y. 2016)(expert opinion inadmissible when expert did not perform any testing and based conclusions only upon his review of plaintiff's medical records and deposition testimony and other documents); United States v. Finley, 301 F.3d 1000, 1006, 1008 (9th Cir. 2000)(appropriate psychology methodology includes "a history of the patient, consisting of family, vocational, educational, medical, and legal histories, the observation of the patient's behavior, and the administration of standard psychological tests"); Dispecpolo v. George, 399 F. Supp. 2d 123, 127 (D. Conn. 2005)(expert satisfied Daubert when it utilized "psychological testing, record review, and other interviewing, …generally accepted methodology in the community of psychiatrists and psychologists for making a medical diagnosis."). Dr. Goldstein failed to follow the standard methodology and therefore, his report should be excluded.

In contrast, Defendants' expert, Dr. Karen Dahlman, performed a comprehensive Independent Medical Evaluation[6] on Plaintiff on May 18 and 21, 2016 which illustrates the appropriate and necessary procedures required to arrive at a scientifically acceptable opinion (irrespective of what the opinion is). She reviewed the Riverdale Record, and administered a number of tests on Plaintiff. (Dahlman Report P. 1). Dr. Dahlman found that Plaintiff's "profile should be interpreted with the caution signaled by her tendency to exaggerate her emotional

---

[6] A copy of Dr. Dahlman's report is annexed as Exhibit C to the Kelly Dec.

Firm:44801725v1

distress. *This tendency is consistent with screening done at the clinic in Riverdale, at which time she failed two malingering screening tests."* (Id. P. 6 *emphasis added*).

Dr. Dahlman also reviewed the Goldstein Report and his deposition, and performed an evaluation of the Goldstein Report. She found it particularly troublesome that Dr. Goldstein "performed *no testing* to measure Ms. Mayo-Coleman's symptoms, nor did he administer any instruments designed to qualify or quantify the extent of her impression management." (Id. at P. 7) (emphasis added). In addition, Dr. Dahlman found that Dr. Goldstein reached his conclusions about Plaintiff based on a single 2-hour meeting with her and review of the Riverdale Mental Health Association record. Dr. Goldstein took the veracity of what Plaintiff told him at "face value…without the benefit of appropriate measures designed to validate her assertions." (Id.)

Dr. Goldstein did not dispute that he did not administer a number of <u>standard</u> <u>tests</u> to Plaintiff. For example, Dr. Goldstein did not use the Patient Health Questionnaire (PHQ-9).[7] (Dep. Tr. P. 107, L. 5-13). He also did not use the Beck Depression Inventory[8] (BDI), the Zung Self-Rating Depression Scale,[9] Center for Epidemiologic Studies depression scale[10] (CESD) or the Hamilton Rating Scale for Depression[11] (HRSD). (Dep. Tr. P. 107, L. 20 – P. 108, L. 21). The conclusion is clear: he arrived at his opinion without any testing whatsoever. In contrast, Dr. Dahlman administered eight tests (listed at page 1 of her report).

---

[7] The Patient Health Questionnaire (PHQ-9) is a 9-question instrument given to patients to screen for the presence and severity of depression. https://en.wikipedia.org/wiki/PHQ-9

[8] The Beck Depression Inventory is a 21-question multiple-choice self-report inventory. It is "one of the most widely used psychometric tests for measuring the severity of depression." https://en.wikipedia.org/wiki/Beck_Depression_Inventory

[9] The Zung Self-Rating Depression Scale is a "short self-administered survey to quantify the depressed status of a patient." https://en.wikipedia.org/wiki/Zung_Self-Rating_Depression_Scale

[10] The Center for Epidemiologic Studies Depression Scale (CES-D) is a "brief self-report questionnaire…to measure depressive symptoms severity in the general population." https://en.wikipedia.org/wiki/Center_for_Epidemiologic_Studies_Depression_Scale

[11] The Hamilton Rating Scale for Depression (HRSD) is a multiple item questionnaire used to provide an indication of depression and as a guide to evaluate recovery. https://en.wikipedia.org/wiki/Hamilton_Rating_Scale_for_Depression

Firm:44801725v1

Dr. Dahlman also noted that in Dr. Goldstein's deposition that he testified that he "considered and ruled out any…malingering." However, she questions:

> By what evidence does he rule out malingering? Dr. Goldstein states that he reviewed the psychiatric records from a clinic in Riverdale. In those records, two informal tests of malingering were conducted, and Ms. Mayo-Coleman failed them both. Current testing by this examiner suggests likely impression management, poor effort and exaggeration of symptoms.

Dahlman Report P. 8. In addition, Dr. Dahlman found that Dr. Goldstein inappropriately dismissed the possibility of prior depression, despite the fact that Plaintiff apparently was suffering depression that was severe enough that she attempted suicide in 2000. Id.

Notably, Dr. Goldstein was critical of another psychologist's similar methodology (or lack thereof) in a report he rendered for the undersigned attorneys in another case two years ago.[12] He wrote, in part:

> In my professional opinion, Dr. Bryant's methodology was seriously flawed and failed to provide a valid scientific basis for his forensic conclusions. He uncritically accepted at face value Ms. H's version of events associated with her psychiatric complaints. He made no attempt to review any available documents containing relevant factual information, such as her records from Lincoln Hospital and Greenhope Services, her deposition transcript, or the text messages exchanged with [    ]. He failed to conduct any collateral interviews or administer any psychological testing. He never considered the likely adverse impact of a multitude of other psycho-social stressors affecting Ms. H. He never considered or ruled out the possibility of malingering and secondary gain motivations in the context of litigation. Everything he knew came solely from the patient-litigant (Ms. H) and solely from her point of view. He failed to make any attempt whatsoever to corroborate or verify her version of events measured against other information sources, *e.g.*, records, documents, depositions, and so on. The type and amount of data he obtained, as well as its source, restricted the basis of his opinions and conclusions, in essence, to "I can only tell you what my patient-litigant told me." This was not an adequate, meaningful scientific

---

[12] A copy of Dr. Goldstein's earlier opinion is annexed as Exhibit D to the Kelly Dec. The name of the plaintiff in that action has been redacted.

- 14 –

> foundation on which to base his opinions and conclusions about the nature, extent, and causation of Ms. H's claimed injuries.
>
> In addition to the above, Dr. Bryant . . . also failed to consider other alternative sources of psycho-social stress as likely substantial causes that would account for her claimed psychiatric symptoms. He failed to document her claimed symptoms with the specificity required to demonstrate that in fact they met the requisite diagnostic criteria for a diagnosis of "Major Depressive Disorder." . . . The diagnosis he made failed to satisfy the requisite diagnostic criteria and was inaccurate; his conclusion in regard to causation was based solely on the self-serving statements of the patient-litigant which he failed to corroborate in any way (as discussed above). He also failed to take into account other alternative likely causes of her claimed symptoms.

Dr. Goldstein's failure to perform *any* testing to measure Plaintiff's symptoms and possible malingering, and his failure to administer instruments to qualify or quantify the extent of her impression management renders his report unreliable under Daubert and therefore should be precluded.

## POINT II

## PLAINTIFF SHOULD BE PRECLUDED FROM TESTIFYING ABOUT CERTAIN EVENTS IN HER LIFE UNRELATED TO HER EMPLOYMENT

Defendant seeks a ruling that Plaintiff be precluded from testifying about incidents in her life that are remote in time and unrelated to her employment with ASH. For example, as discussed above, Plaintiff's deposition, the Riverdale Record and the Goldstein Report refer to events that may or may not have had some lingering effect on Plaintiff's psychological well-being. Specifically: (a) Plaintiff was raped at the age of 14 by a friend of the family, as a result of which consequently, she became pregnant and had an abortion and she believes she is unable to have children; (b) her father died in 1980 and her brother died in 2002; and (c) she attempted a suicide in 2000. These events are too remote to be relevant, and should be precluded. Courts have suggested that testimony of regarding events occurring outside the relevant statute of limitations should not be admissible as a source of Plaintiff's emotional distress. Annis v.

- 15 –

County of Westchester, 136 F.3d 239, 247 (2d Cir. 1998)(finding evidence depicting police department as sexist and sexually undisciplined, which a reasonable jury would have found as deplorable, was improperly admitted at trial).

In contrast, other events may be relevant to Plaintiff's emotional state in 2012 – 2013. Her mother died in 2008. Her sister died suddenly of an aneurysm in 2013. Her boyfriend of 12 years and she split up in 2015. These events may be relevant due to their relative proximity to the events of 2012 that are the remaining subject of this action and Plaintiff's allegations of continuing mental distress.

The rape 45 years ago also requires special consideration. Plaintiff testified at her deposition that after 20 or more years, she had managed to put this terrible event out of her mind; in her words, she put the memory in a "Black Box." (See Plaintiff's Dep. Tr. P. 230, L. 4 - P. 233, L. 14).[13] She further testified that Smith's comments reawakened her memory, or "opened the Black Box," and caused her to become depressed in 2012 and 2013. (Id.).

The fact that Plaintiff had lingering effects of this criminal act decades ago is highly relevant. The general rule in torts is that a "tortfeasor 'takes the plaintiff as he finds him,'" that is, a tortfeasor is responsible for physical injuries even if the victim is fragile or easily injured. However, what is referred to in torts class as the "eggshell skull doctrine" has been applied only in cases where the plaintiff suffered physical injuries. Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 908 (2d. Cir. 1993). The effect of Ragin is that "a plaintiff is entitled to recover only for the emotional suffering that …would cause a person who did not have plaintiff's heightened emotional sensitivity." Schipper v. United States, 1998 U.S. Dist. LEXIS 16653 (E.D.N.Y. Sept. 14, 1998). In this case, where Plaintiff suffered no physical injuries, she can only recover damages for her emotional suffering, as a result of the alleged hostile work

---

[13] A copy of excerpts cited herein from the transcript of Plaintiff's deposition in annexed as Exhibit E to the Kelly Dec.

Firm:44801725v1

environment, that a person who did not have her unique heightened emotional sensitivity would suffer.[14]

Under Fed. R. Evid. 403, even relevant evidence should be precluded when its probative value is outweighed by prejudice or other factors.  While the fact that Plaintiff testified that she had a strong reaction to Smith's statements because of the event 45 years ago is relevant, detailed testimony regarding that event from Plaintiff's remote past is not relevant to the assessment of any potential damages in this case, and even if relevant, highly prejudicial.  Courts have held that evidence of a sexual assault, unrelated to the allegations of the complaint, should be excluded on the grounds that the danger of unfair prejudice outweigh the evidence's probative value. Campbell v. Ingersoll Mining Machine Co., 893 F.2d 295, 928 (7th Cir. 1990).  In addition, "remote events" that occurred over five years before the statute of limitations cut off were properly excluded under Rule 403 when they would "create a significant danger that the jury would base its assessment of liability" on the remote events.  Tennison v. Circus Circus Enter., Inc., 244 F.3d 684 (9th Cir.

Should Plaintiff present evidence to the jury regarding the rape in her distant past, it would be almost inevitable that the jury would be unduly influenced by sympathy.  Indeed, it is likely that Plaintiff would have an emotional reaction on the witness stand should the details of this event be mentioned, as she did during the deposition. (See Plaintiff's Dep. Tr. P. 235).  It is well settled law that evidence that has no purpose but to appeal to the sympathy of the jury is inadmissible.  *See, e.g.,* Rebolledo v. Herr-Voss Corp*.,* 101 F. Supp. 2d 1034, 1036 (N.D. Ill. 2000) (party not permitted to offer evidence or argument of how a judgment would affect him financially); Conkey v. N.Y. Cent. R.R.*,* 206 Misc. 2d 1077, 1085, 136 N.Y.S.2d 189, 196 (Sup. Ct. Monroe County 1954) ("A verdict resulting from sympathy is equally as objectionable as one

---

[14] Defendant will submit a proposed jury instruction on this point.

- 17 –

resulting from passion and prejudice"). However, Defendant should be allowed to inquire, without offering details, as to the memory of a particular but unspecified traumatic event in her past that affected her in 2012, which memory was awakened by the alleged statements of Smith, to support the argument that whatever emotional distress the jury may find is the result of Plaintiff's heightened sensitivity and is not compensable. Defendant respectfully requests an *in limine* ruling:

    (a) precluding detailed testimony about the rape and its aftermath;

    (b) precluding evidence of emotional events prior to 2008; and

    (c) notwithstanding the foregoing, permitting Defendant to introduce evidence of Plaintiff's reaction to Smith's alleged comments in so far as they brought back memories of an unspecified traumatic event.

## CONCLUSION

For all the above reasons, Defendant respectfully requests that the Court preclude Plaintiff from offering into evidence any expert testimony of Dr. Goldstein and to preclude testimony regarding events in Plaintiff's life that are remote from the time period during which Smith is alleged to have sexually harassed Plaintiff.

**Dated:** January 3, 2018

        **EPSTEIN BECKER & GREEN, P.C.**
        Attorneys for Defendant American Sugar
        Holdings, Inc. and Bob Jandovitz

        By: *s/Kenneth J. Kelly*
        Kenneth J. Kelly
        Robert D. Goldstein
        250 Park Avenue
        New York, New York 10177-0077
        Telephone: (212) 351-4500
        Email: rgoldstein@ebglaw.com
        And

Firm:44801725v1

– 19 –

By: *s/ Carol Faherty*
Carol J. Faherty
One Landmark Square, Suite 1800
Stamford, Connecticut 06901
Telephone: (203) 348-3737
Email: cfaherty@ebglaw.com