USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/15/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- x
ROSANNA MAYO-COLEMAN,

        *Plaintiff*,

        -*against*-

AMERICAN SUGAR HOLDINGS, INC.,

        *Defendant*.
---------------------------------------------------------- x

14-cv-79 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Following a four-day jury trial, the jury returned a verdict in favor of Plaintiff Rosanna Mayo-Coleman on her sole claim that Defendant American Sugar Holdings, Inc. subjected her to a hostile work environment in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"), due to her sexual harassment by her supervisor. The jury awarded Plaintiff $1.7 million in compensatory damages and $11.7 million in punitive damages. Since the standard of proof for both statutes is the same, the jury was not asked to distinguish between the Title VII and NYSHRL claims when awarding damages.

The NYSHRL does not provide for punitive damages, however, and Title VII caps the sum of compensatory and punitive damages at $300,000. Accordingly, Plaintiff moves to conform the verdict by allocating $1,699,999 of her compensatory damages award to the uncapped NYSHRL claim and the remaining $1 in compensatory damages to the Title VII claim (for a total of $1.7 million in compensatory damages), allowing her to recover $299,999 in punitive damages under the Title VII claim. In this way, Plaintiff seeks to recover a total of $1,999,999. Defendant contends that Plaintiff is entitled to no more than $30,000 in

compensatory damages and no punitive damages. Hence, Defendant moves under Federal Rules of Civil Procedure 50 and 59 for either a new trial on damages or, in the alternative, a remittitur of the compensatory damages and vacatur or remittitur of the punitive damages. For the following reasons, the Court GRANTS Plaintiff's motion to conform the verdict, GRANTS Defendant's request to remit the compensatory damages, and DENIES Defendant's request to vacate or remit the punitive damages.

## **LEGAL STANDARD**

Under Rule 50, a court may grant judgment as a matter of law to the moving party after the jury has found in favor of the non-moving party on an issue where there is no "legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law is proper only upon a finding that:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir. 1994) (quotation and alterations omitted). In contrast, a motion for a new trial under Rule 59 may be granted when, in the court's opinion, "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quotation and alterations omitted).

In considering such a motion, the court normally is free to weigh the evidence itself and need not view it in the light most favorable to the prevailing party. *Id.* When considering whether a damages award is excessive, however, all evidence and factual inferences are to be construed in favor of the non-movant and the court is to give considerable deference to the jury's determinations. *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir. 1993).

Furthermore, the Seventh Amendment prohibits courts from simply reducing a jury's award of damages. *Id.* at 684. Rather, "[i]f a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F.3d 93, 96 (2d Cir. 1995). "Where the basis for the remittitur order is the district court's view that the award is intrinsically excessive, i.e., is greater than the amount a reasonable jury could have awarded but the excess is not attributable to a discernible error, the court should reduce the award only to the maximum amount that would be . . . not excessive." *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004) (quotations and citations omitted).

## DISCUSSION

### A. Allocation of Compensatory and Punitive Damages

There is no cap on compensatory damages for claims arising under the NYSHRL; but punitive damages are unavailable, except in cases of housing discrimination. *See* N.Y. Exec. Law § 297(9); *Thoreson v. Penthouse Int'l, Ltd.*, 606 N.E.2d 1369, 1372-73 (N.Y. 1992). The sum of compensatory and punitive damages for claims arising under Title VII is limited to $300,000 where, as here, the defendant has more than 500 employees. *See* 42 U.S.C. § 1981a(b)(3). Nevertheless, a plaintiff that recovers a single award under parallel statutes may "be paid under the theory of liability that provides the most complete recovery." *Magee v. United States Lines, Inc.*, 976 F.2d 821, 822 (2d Cir. 1992). Hence, courts regularly allocate all, or nearly all, of the compensatory damages to the state law claims and the punitive damages to the Title VII claims in order to maximize plaintiffs' recovery by removing the compensatory damages from Title VII's statutory cap. *See, e.g., Anderson v. YARP Rest., Inc.*, No. 94-cv-7543,

1997 WL 27043, at *7 (S.D.N.Y. 1997) (allocating entire $65,000 in compensatory damages to NYSHRL claim and entire $50,000 in punitive damages to Title VII claim in order to "permit[] plaintiff to receive the full amount awarded by the jury without exceeding the legal limits placed upon sexual harassment claims under Title VII and the HRL"); *Torres v. Carribean Forms Mfr.*, 286 F. Supp. 2d 209, 218-19 (D.P.R. 2003), *aff'd and remanded sub nom. Rodriguez Torres v. Carribean Forms Mfr., Inc.*, 399 F.3d 52 (1st Cir. 2005) (allocating $1 in compensatory damages to Title VII claim "so as to allow for the imposition of punitive damages under said statute," allocating the remaining $249,999 in compensatory damages to state law claims, and allocating $199,999 in punitive damages to Title VII claim). Plaintiff's motion requests such an allocation.

Defendant's sole objection to Plaintiff's motion is that it is premature. Defendant argues that there can be no allocation of damages until the Court rules on Defendant's motion for a new trial on damages or, in the alternative, a remittitur of the compensatory damages and vacatur of the punitive damages. Defendant cites no caselaw in support of this argument, and there is no reason why the Court cannot grant Plaintiff's motion before turning to Defendant's motion and deciding whether the damages should be further remitted or vacated. Indeed, courts regularly rule on both types of motions at the same time. *See, e.g., Anderson*, 1997 WL 27043, at *6-9 (ruling on allocation of damages and remittitur); *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 669-76 (E.D.N.Y. 1996) (ruling on allocation of damages and vacatur). Thus, in order to provide Plaintiff with the opportunity for the most complete recovery, the Court allocates $1 of the compensatory damages award to the Title VII claim, allocates the remaining $1,699,999 of the compensatory damages award to the NYSHRL claim, allocates the entire punitive damages award to Title VII, and reduces the punitive damages award from $11.7 million to $299,999 in light of Title VII's statutory cap.

4

## B. Remittitur of Compensatory Damages

Defendant argues that the jury's $1.7 million award of compensatory damages for emotional distress is excessive and should be remitted to $30,000 or less. Because $1,699,999 of the award is allocated to the NYSHRL claim, the Court evaluates the excessiveness of the award under New York law. *See Stampf v. Long Island R.R.*, 761 F.3d 192, 204 (2d Cir. 2014); *Anderson*, 1997 WL 27043, at *8. Under New York law, a court "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). This "deviates materially" standard is different from the "shock the conscience" standard for reviewing jury verdicts in federal claims, and it allows courts to more closely scrutinize jury awards. *See Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 422-24 (1996). "To determine whether a jury award is excessive within the meaning of § 5501(c), New York courts compare it with awards in similar cases." *Stampf*, 761 F.3d at 204. In making this comparison, courts consider "the duration of a complainant's condition, its severity or consequences, any physical manifestations, and any medical treatment." *In re New York City Transit Auth.*, 577 N.E.2d 40, 55 (N.Y. 1991). Further, emotional distress damages must be "reasonably related to the wrongdoing" of the defendant. *Id.*

For claims arising under the NYSHRL, "the range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000." *Watson v. E.S. Sutton, Inc.*, No. 02-cv-2739, 2005 U.S. Dist. LEXIS 31578, at * 46-47 (S.D.N.Y. 2005). The cases in which courts permit higher damages typically involve medical treatment and physical manifestation of symptoms such as "continued shock, nightmares, sleeplessness, weight loss, or humiliation, or of an inability to apply for a new position or to enjoy life in general." *See id.* at *44 (noting that decisions "approving multi-

5

hundred-thousand dollar awards for emotional damages all involve post-traumatic stress disorder, and plaintiffs who were forced to be medicated and out of work for extended periods of time.").

This case seems to fit within the category of cases with such extraordinary circumstances. Plaintiff is a fifty-nine year old woman who works in Defendant's sugar factory. (Tr. 113:20–116:14.) From 2008 to 2013, her immediate supervisor was Tyrone Smith. (Tr. 127:6-20, 226:25–227:3.) Plaintiff testified that Smith repeatedly harassed Plaintiff by telling her that "he would tap that ass if [she] wasn't so old," "[her] boobs got big," and that she was "an old coon." (Tr. 183:6-7, 133:24, 182:21-22.) Smith "was constantly leering" at Plaintiff, "licking his lips," and would "come next to [her] and start breathing real heavy like he's having sex." (Tr. 135:3-8.) Three to four times a month, Smith would call Plaintiff into his office, instruct her to close the door, force her to stand next to him, and subjected her to unwelcome verbal and physical harassment, such as smacking her on her "rear end." (Tr. 150:11–153:11, 175:1-20.)

Plaintiff testified that she experienced severe emotional distress during this time: she stopped eating; she lost weight; her hair fell out; her stomach was tied in knots; and she had migraine headaches from the time she woke up until the time she went to sleep. (Tr. 184:14–185:6.) Plaintiff became depressed, which impacted her relationship with her boyfriend of 12 years and caused them to break up. (Tr. 205:15–206:13.) From June 6 to August 13, 2012, Plaintiff took medical leave from work upon her doctor's orders that she was "extremely depressed" due to "work stressors." (Tr. 203:3-12, 211:10-17; Pl.'s Exs. 12, 16.) During this leave, for the first time in her life, Plaintiff saw a psychiatrist and a therapist, and she began taking psychotropic medications. (Tr. 203:3–205:14, 228:20–229:13.)

Plaintiff's testimony was supported by three of her co-workers who testified that Plaintiff

6

complained to them about Smith's behavior and Plaintiff was visibly distressed by it, and by contemporaneous handwritten notes that Plaintiff made in notebooks which she maintained beginning in 2012. (Tr. 33:2–36:17; Tr. 47:21–54:8; Tr. 85:5–90:21; Tr. 180:14–182:20; Pl.'s Ex. 25.) Plaintiff's expert psychiatric witness, Dr. Robert Goldstein, diagnosed her with major depressive disorder, which is "one of the most serious psychiatric conditions." (Tr. 311:9-19.) Dr. Goldstein also testified that there was a direct causal link between Smith's behavior and the onset of this disorder. (Tr. 312:9–313:3.) Given Plaintiff's medical treatment, leave from work, psychiatric diagnosis, physical manifestation of symptoms, breakdown in relationships, and corroborating lay and expert testimony, the Court finds that this case contains circumstances that would be considered "extraordinary" under New York law.

Even so, Defendant argues that the Court should remit compensatory damages to $30,000 or less by citing several cases with similarly egregious facts, in which New York courts nonetheless remitted awards to $50,000 or less. For example, in *Matter of State of New York v. New York State Div. of Human Rights*, the court remitted emotional distress damages from $50,000 to $20,000 where: plaintiff's supervisor made crude sexual comments; he called her into his office, locked the door, and touched her inappropriately; and plaintiff's employment was terminated due to her difficulties working with him. 284 A.D.2d 882, 883-84 (N.Y. App. Div. 3d Dep't 2001). Further, in *New York State Div. of Human Rights v. Young Legends, LLC*, the court remitted emotional distress damages from $500,000 to $50,000 where defendant, a sandwich shop owner, pressured plaintiff, a high school student working for him, into visiting him alone in his apartment, where he forced her to engage in sexual intercourse. 90 A.D.3d 1265, 1266, 1270 (N.Y. App. Div. 3d Dep't 2001).

These discrepancies, however, can be explained by the fact that, despite the reprehensible

7

behavior, the courts did not consider those plaintiffs' emotional distress to be especially severe. *See State of New York*, 284 A.D.2d at 884 ("However, considering all of the circumstances, including the absence of any proof of the severity and consequences of her condition, we find that the evidence cannot support an award in excess of $20,000." (internal citation and quotations omitted)); *Young Legends*, 90 A.D.3d at 1270 ("[S]he attended only two counseling sessions, apparently required no further medical or psychological treatment, and within several months was able to return to work for a different employer."). Moreover, the Court respectfully disagrees with the decision in *Young Legends*. A high school student who has been threatened and raped by her employer surely deserves more than $50,000 in compensatory damages.

Relatedly, Plaintiff testified that she had been raped at the age of 14, and that Smith's behavior made her feel "violated all over again." (Tr. 189:20–190:13.) As the Court previously explained when ruling on Defendant's motions *in limine*, and as the jury was instructed, the defendant "takes the plaintiff as he finds her." (Feb. 7, 2018 Conference Tr. at 15-16; Tr. 828:13-22.) Thus, Plaintiff's increased susceptibility to emotional distress from sexual harassment due to her previous experience as a rape victim could be considered when calculating compensatory damages. *See Stampf*, 761 F.3d at 207 n.5 ("Although the average victim of malicious prosecution may not have experienced such a high degree of stress and anxiety from Trigg's malicious prosecution, a defendant must take a plaintiff as she finds him and, therefore, is responsible for the harm she inflicts on a person even if that harm is exacerbated by the person's unknown infirmities." (quotations and alterations omitted)). In its reply brief, Defendant seeks to relitigate this issue by arguing that this instruction was improper because this "eggshell skull" doctrine applies only when a plaintiff suffers physical injuries, but Defendant has already been fully heard on this issue, and the Court will not reconsider its ruling. *See United States v. Uccio*,

940 F.2d 753, 758 (2d Cir. 1991) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."). In any event, Plaintiff presented evidence of physical manifestations of her symptoms in the form of her weight loss, hair loss, stomach problems, and migraines.

In light of these circumstances, Plaintiff argues that the Court should either allow the jury's verdict of $1.7 million to stand or, at most, remit it to $1.5 million. Many of the cases that Plaintiff cites, however, are not sexual harassment cases and involve more harm than emotional distress alone. *See, e.g., Osorio v. Source Enterprises, Inc.*, No. 05-cv-10029, 2007 U.S. Dist. LEXIS 18725, at *14-17 (S.D.N.Y. Mar. 2, 2007) (denying motion for remittitur in unlawful retaliation claim where jury awarded $4 million for emotional distress and damage to reputation).

In the sexual harassment cases, even when extraordinary circumstances are present, courts seldom permit emotional distress damages in any amount close to the $1.7 million awarded here. *See, e.g., Singleton v. City of New York*, 496 F. Supp. 2d 390, 394 (S.D.N.Y. 2007) (Rakoff, J.) (reducing jury award of $1 million in compensatory damages under NYSHRL to $300,000, where plaintiff presented evidence that his supervisor's sexual harassment led to the dissolution of plaintiff's relationship with the mother of his child, which in turn caused plaintiff "extensive anxiety"); *Bianco v. Flushing Hosp. Med. Ctr.*, 2009 N.Y. Misc. LEXIS 5275, at *17-19 (N.Y. Sup. Ct. Queens Cty. Sept. 11, 2009) (reducing jury award of compensatory damages under NYSHRL from $8 million to $750,000 where plaintiff presented lay and expert testimony that she "suffered from post-traumatic stress disorder . . . , major depressive disorder, flashbacks, anxiousness and related emotional problems" as a result of sexual harassment). Moreover, unlike other sexual harassment cases with extraordinary circumstances and large jury verdicts, Plaintiff never stopped working in the same job that she held during the period of harassment.

9

*Compare Katt v. City of New York*, 151 F. Supp. 2d 313, 370 (S.D.N.Y. 2001) (upholding jury award of $400,000 in compensatory damages where plaintiff was "suffering from permanent mental disabilities, unable to work, unable to maintain sexual intimacy, [and] unable even to perform household chores" as a result of sexual harassment), *with Caravantes v. 53rd St. Partners, LLC*, No. 09-cv-7821, 2012 U.S. Dist. LEXIS 120182, at *70-78 (S.D.N.Y. Aug. 23, 2012) (finding after bench trial that supervisor's harassment was "egregious" and the impact on plaintiff's mental health was "significant" where plaintiff suffered trouble sleeping, marital problems, major depressive disorder, and suicidal thoughts, but awarding only $150,000 in emotional distress damages because plaintiff's "condition is treatable" and plaintiff "is currently working in a restaurant"). On the other hand, the Court also accounts for inflation and considers the present value of the amounts awarded in these cases. *See DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003) ("When considering the sizes of the awards in earlier cases, we must take into account inflation . . . .").

Upon considering all of the above factors, the Court determines that an award of $500,000 in compensatory damages under the NYSHRL is the greatest amount that can be awarded without being excessive. Thus, the compensatory damages award will be remitted, and it will consist of $500,000 under the NYSHRL and $1 under Title VII.

### C. Vacatur or Remittitur of Punitive Damages

Defendant argues that the punitive damages award of $299,999 should either be vacated because the evidence does not support any award of punitive damages, or remitted to $30,000 because any greater award violates due process. In a Title VII claim, "a plaintiff may recover punitive damages where the plaintiff demonstrates that the defendant 'engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected

rights of an aggrieved individual.'" *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 356 (2d Cir. 2001) (quoting 42 U.S.C. § 1981a(b)(1)). The Due Process Clause, however, "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

Here, the evidence supports an award of punitive damages. There is sufficient evidence to support the jury's finding that Defendant acted with malice or reckless indifference in failing to address Smith's sexual harassment of Plaintiff. For example, in one instance, Human Resources Manager Robert "Bob" Jandovitz received a grievance from Plaintiff that mentioned overtime pay and referenced several articles in the governing Collective Bargaining Agreement addressing discrimination. (Tr. 495:10-15; Pl.'s Ex. 11; Pl.'s Ex. 8 at DEF 0000617.) Jandovitz admitted that he was "not a big fan of grievances" and that he did not look up the articles referenced in Plaintiff's grievance. (Tr. 485:18-19, 495:8–496:6.) Upon meeting with Plaintiff, Jandovitz told her "I don't like grievances" and told her to go back downstairs and meet with her immediate supervisor, Smith, about her grievance. (Tr. 197:14–198:25.) Smith, of course, was the source of Plaintiff's difficulties. Plaintiff testified that during this meeting, she attempted to show Jandovitz notes detailing the sexual harassment, but Jandovitz told her she had "too many notes" and that they could follow up that Friday, but Jandovitz never called Smith to have Plaintiff released for a follow-up meeting. (Tr. 199:8-24, 200:25–201:15.) Plaintiff testified that after this meeting, she was at her lowest point because "now Bob knew, and they still ignore[d] my cries for help." (Tr. 201:16-19.) Even assuming that Plaintiff did not clearly raise concerns of sexual harassment in the grievance or the meeting, the jury was entitled to infer from Jandovitz's dismissiveness that Defendant recklessly caused Plaintiff to believe that her pleas for help would be ignored and that she would first have to raise any complaints about sexual

11

harassment with her harasser. *Cf. Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-cv-3461, 2016 U.S. Dist. LEXIS 174364, at *16 (E.D.N.Y. Dec. 16, 2016) (finding sufficient evidence to support punitive damages where defendant ignored plaintiffs' pleas for help and permitted co-worker to continue harassing plaintiff).

Moreover, Plaintiff presented evidence that Human Resources Manager Nicole Copeland's eventual investigation into Plaintiff's sexual harassment claims was a "sham." (Tr. 759:19–770:10, 772:1-12.) Copeland's notes contained a list of nine "people to interview," but Copeland curiously failed to interview three of them—Fred Paniccia, Fred Gaffney, and Clark Simpson—all of whom corroborated Plaintiff's complaints upon testifying at trial. (Pl.'s Ex. 5 at 1; Tr. 33:2–36:17; Tr. 47:21–54:8; Tr. 85:5–90:21.) Copeland determined, contrary to the jury's findings, that no sexual harassment occurred. Thus, a reasonable jury could conclude that Defendant acted with reckless and callous indifference to Plaintiff's federally protected rights. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001) (reversing district court's decision to prohibit punitive damages where jury could have inferred from evidence that management conducted "sham" investigation designed to discredit plaintiff and protect managers who should have taken action sooner); *Baty v. Willamette, Inc.*, 172 F.3d 1232, 1244-45 (10th Cir. 1999) (affirming award of punitive damages based on evidence that management conducted sham investigation and condoned harassment).

The punitive damages award of $299,999 also does not violate due process. To determine whether punitive damages are grossly excessive, courts consider three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized

or imposed in comparable cases." *State Farm*, 538 U.S. at 418. Here, each of these guideposts weighs against finding the award to be grossly excessive.

First, the evidence supports a finding of particularly reprehensible misconduct. Aggravating factors that contribute to the degree of reprehensibility include: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996). Defendant's failure to act, although not violent in itself, allowed Smith to continue harassing Plaintiff, which caused Plaintiff great mental anguish and forced her to take a mental health leave. Such conduct by Defendant suggests "indifference to or reckless disregard for the health and safety of others," which is more reprehensible than conduct that inflicts harm that is "purely economic in nature." *BMW of North America v. Gore*, 517 U.S. 559, 576 (1996). As detailed above, there was sufficient evidence, including the evidence that Nicole Copeland conducted a "sham" investigation, to allow the jury to conclude that Defendant acted with malice or deceit. Plaintiff also presented evidence that Defendant engaged in repeated instances of misconduct by ignoring complaints about Smith's harassment on multiple occasions. In addition to Jandovitz's rejection of Plaintiff's grievance and Copeland's investigation finding no sexual harassment, Fred Paniccia testified that he previously reported Smith's harassment of Plaintiff to Assistant Human Resources Manager Debbie Troche, but she did nothing in response. (Tr. 33:2–36:3.)

Second, there is little disparity between the award of $299,999 in punitive damages and the award of $500,001 in compensatory damages. Although a punitive damages "award of more than four times the amount of compensatory damages might be close to the line of constitutional

impropriety," the punitive damages award here is *less* than the award of compensatory damages. *State Farm*, 538 U.S. at 425. Thus, the punitive damages are "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.

Third, the punitive damages award is also reasonable in comparison to damages awards in other cases. *See, e.g., Luciano v. Olsten Corp.*, 110 F.3d 210, 222 (2d Cir. 1997) (upholding $300,000 punitive damage award against wealthy defendant as "modest"); *Quinby v. WestLB AG*, No. 04-cv-7406, 2008 U.S. Dist. LEXIS 62366, at *13-14 (S.D.N.Y. Aug. 15, 2008) (remitting punitive damages from $1.3 million to $750,000 in gender discrimination case where compensatory damages were $500,000); *Thomas v. iStar Fin. Inc.*, 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007) ("The federal cap . . . provides guidance on what is considered an appropriate civil penalty of comparable misconduct."). Therefore, the punitive damages award does not violate due process, and it is neither vacated nor remitted.

## CONCLUSION

For the reasons stated above, the Court adjusts Plaintiff's damages as follows: $500,000 in compensatory damages under the NYSHRL, $1 in compensatory damages under Title VII, and $299,999 in punitive damages under Title VII, for a total of $800,000 in damages. Plaintiff may elect either to accept these amounts or to proceed to a new trial on damages. Plaintiff has 30 days from the date of this order to inform the Court of her decision. The Clerk of Court is directed to terminate the pending motions at Docket 181 and Docket 183.

Dated: New York, New York
June 5, 2018

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge